BLACKHAWK CONFIDENTIAL & PROPRIETARY

## AUTHORIZED DELEGATE AGREEMENT
## WITH
## BLACKHAWK NETWORK CALIFORNIA

THIS AUTHORIZED DELEGATE AGREEMENT (*"Agreement"*) is entered into effective June 14, 2012 (*"Effective Date"*), by and between Blackhawk Network California, Inc., a California corporation (*"Blackhawk CA"*); Blackhawk Network, Inc., an Arizona corporation (*"Distributor"*); and the Agent identified on the signature page of this Agreement (*"Agent"*).

### BACKGROUND

Blackhawk CA issues and/or distributes and services (in some cases on behalf of third-party issuers) certain prepaid stored value cards and products that participate in a Payment Network, and certain other products (e.g., the "Reloadit Pack") that are not issued under the authority of a Payment Network, all of which are redeemable for products or services at multiple, unaffiliated merchants or at ATMs, or both (each such Blackhawk CA-issued, distributed and/or serviced card or product is referred to herein as an *"Open Loop Card"*), and wishes to engage the Agent, as the limited legal agent and authorized delegate of Blackhawk CA as part of Distributor's Alliance Partner Program, to offer and sell the Open Loop Cards and engage in certain money transmission services (each such Open Loop Card and money transmission service as may be approved by Blackhawk CA) (as so approved, the "Authorized Delegate Services"). Distributor is in the business of marketing and distributing prepaid cards, among other things, to retailers, and desires to distribute the Open Loop Cards to Agent for sale to consumers pursuant to the terms and conditions of this Agreement. Blackhawk CA and Distributor are parties to an agreement (*"Program Management Agreement"*) by which each of them undertakes certain obligations and receives certain benefits in conjunction with Distributor's marketing and distribution of the Open Loop Cards as part of Distributor's Alliance Partner Program. Agent and Distributor are parties to an agreement (*"Alliance Partner Agreement"*) by which Agent offers various prepaid card products and related services through its store locations as part of Distributor's Alliance Partner Program. Agent desires to provide the Authorized Delegate Services to Blackhawk CA via Distributor's Alliance Partner Program in accordance with the terms and conditions of this Agreement and the Program Management Agreement.

### AGREEMENT

1. **Appointment and Acceptance; No Sub-Agents; Relation to Alliance Partner Agreement.** Blackhawk CA hereby (1) confirms the appointment of Distributor as its program manager, distributor and independent contractor with the authority to distribute and otherwise make available the Open Loop Cards to Agent for sale through Distributor's Alliance Partner Program; and (2) appoints Agent as its limited agent and authorized delegate for the sole purpose of providing the Authorized Delegate Services, all in accordance with both Applicable Law and this Agreement; and Agent hereby accepts such appointment. Blackhawk CA also acknowledges and agrees that it shall comply with Applicable Law. Agent will not appoint or authorize sub-agents or sub-delegates without first obtaining the written approval of Blackhawk CA and any required regulatory approvals. Blackhawk CA will not appoint or authorize sub-agents or sub-delegates without first obtaining any required state regulatory approvals. Agent acknowledges and agrees that the provisions of the Alliance Partner Agreement apply to the Open Loop Cards and that its obligations with respect to the Open Loop Cards pursuant to this Agreement are supplementary to its obligations thereunder; provided, however, that to the extent (if any) that the Alliance Partner Agreement conflicts with this Agreement, this Agreement prevails with respect to the Authorized Delegate Services.

2. **Compliance Requirements; Agent Signage.** Each of Agent and Blackhawk CA acknowledges and understands that, by engaging in Authorized Delegate Services, each is subject to the supervision, examination and regulation of applicable federal and state regulatory agencies, including those with oversight for money transmission and money services businesses. Agent will comply with Applicable Law, including the state-specific provisions attached hereto as Exhibit B (as updated by Blackhawk CA from time to time) and Network Rules concerning the offer and sale, Load and re-Load of Open Loop Cards. To the extent (if any) that the main body of this Agreement conflicts with any state-specific provision, the state-specific provision prevails with respect to the Agent's Authorized Delegate Services in the applicable state. Agent will conduct its money transmission activities strictly in accordance with all written procedures provided by Blackhawk CA. Distributor or Blackhawk CA will promptly provide Agent with applicable guidelines for compliance with the Bank Secrecy Act and anti-money laundering laws. Agent will cooperate with Blackhawk CA and Distributor pursuant to Blackhawk CA's, Distributor's or any applicable third-party issuer's anti-money laundering program and Applicable Law, including collecting data, reporting and investigating incidents. Agent will display at each Approved Store any signs, decals, and other display and disclosure materials required to be posted by Blackhawk CA or by any state law applicable to Agent's Authorized Delegate Services, including materials furnished by Blackhawk CA via Distributor. Agent understands that if Agent exceeds the authority granted under this Agreement, then this Agreement is subject to cancellation and Agent is subject to further disciplinary action by the relevant regulator.

3. **Collection, Fees, Fund Maintenance and Settlement.**

a) Agent will collect the Purchase Price from the purchaser of each Open Loop Card at its Approved Stores at the point of sale (including re-Loads). Agent will hold the Purchase Price of each Open Loop Card, minus the Agent Commission described in Section 3(b) below, in a general account or the Designated Account in trust solely for the benefit of Blackhawk CA, and no part of the Load Amount will be deemed the property of, or an asset of, Agent. Until remitted to Blackhawk CA, the aggregate of any and all Load Amounts that are commingled with other property of Agent will be impressed with a trust in favor of Blackhawk CA. Agent (i) will not use all or any portion of the Load Amounts for its corporate purposes, including by granting any interest or right to the Load Amounts to any third party; (ii) will not voluntarily make all or any portion of the Load Amounts available to its creditors in the event of bankruptcy; and (iii) will not otherwise take any action inconsistent with Blackhawk CA's ownership of the Load Amounts. Agent is liable for settlement to Distributor (and, thus, to Blackhawk CA) of the full amount of the Purchase Price of each Open Loop Card sold, minus the Agent Commission, as reflected on Distributor's database of transactions, regardless of whether Agent has collected the full Purchase Price from the purchaser.

b) Agent will receive compensation for its services under this Agreement solely as set forth in the Alliance Partner Agreement (the *"Agent Commission"*), and will have no recourse against Blackhawk CA with respect to same.

BLACKHAWK CONFIDENTIAL & PROPRIETARY

c) Upon execution of this Agreement, Agent will deliver to Distributor an ACH authorization (or other electronic funds transfer authorization), and in such form as is satisfactory to Blackhawk CA in its sole discretion, to debit on the "Payment Due" date set forth in Section 3(d) the sum of the Purchase Price (minus the Agent Commission) from a general account or the Designated Account. Agent will maintain such authorization in full force and effect for so long as Agent sells or offers for sale any Open Loop Cards or otherwise provides Authorized Delegate Services. Agent will be responsible for all fees and costs associated with the Designated Account and the ACH authorization, including those incurred in connection with any rejected, failed or re-submitted ACH draft. Distributor reserves the right to charge interest on delinquent settlement payments at the rate of one percent (1%) per month or portion thereof, and a one percent (1%) surcharge of the amount of the rejected/failed ACH draft. Agent will daily deposit into a general account or the Designated Account the aggregate Purchase Price and any other proceeds received from consumers that day in connection with Agent's Authorized Delegate Services; and will ensure that sufficient funds are available in such account to meet Agent's payment obligations hereunder. Each of Blackhawk CA and Distributor reserves the right in its sole discretion to set and periodically adjust a credit limit related to the Agent's Authorized Delegate Services; and furthermore (to the extent necessary in their sole discretion to protect Cardholder funds or to ensure that unbilled, outstanding or unpaid invoices remain within the credit limit), to require prepayment, expedited payment or the provision of adequate security from Agent. Each of Distributor and Blackhawk CA, as applicable, may exercise its rights to enforce Agent's payment obligations hereunder, including suspending Agent's ability to Activate Open Loop Cards immediately upon notice in the event of delinquent settlement or payment failure.

d) Distributor on behalf of Blackhawk CA will deliver electronic invoices to Agent covering sales of Open Loop Cards at Agent's Approved Stores according to the following timetable. In the event that Agent's sales of Open Loop Cards reach One Million Dollars ($1,000,000) in each of two consecutive weeks, then Blackhawk CA reserves the sole right to deliver such electronic invoices each Business Day covering sales during the period since the last Business Day; and Agent shall deposit funds in accordance with Section 3(c) above on the second Business Day following delivery of such invoices. In all cases, such invoices will specify the Purchase Price, the Load Amount and the Agent Commission (the Agent Commission will be retained by Agent). If any invoicing or payment day is a federal holiday, then the invoice or payment will be due the next Business Day.

| Activation Days | Invoice Posted to Agent | Payment Due from Agent |
|---|---|---|
| Sunday, Monday, Tuesday | Wednesday Noon MT | Friday 5PM MT |
| Wednesday, Thursday | Friday Noon MT | Tuesday 5PM MT |
| Friday, Saturday | Sunday Noon MT | Wednesday 5PM MT |

4. **Term and Termination.** This Agreement will become effective on the Effective Date and will continue indefinitely until terminated pursuant to this Agreement ("*Term*"). This Agreement will automatically terminate upon termination of the Alliance Partner Agreement. Blackhawk CA may terminate this Agreement immediately upon notice to Agent and Distributor in the event of any fact or circumstance that Blackhawk CA reasonably believes requires or makes it advisable under Applicable Law to terminate Agent's status as an agent or authorized delegate of Blackhawk CA. This Agreement also may be terminated by a party immediately upon notice to the defaulting party if any one or more of the following events (each, an "*Event of Default*") shall occur and be continuing: (a) the failure of Agent to remit any payment required by this Agreement, which continues unremedied for longer than two (2) Business Days after written notification; (b) the failure of a party to observe or perform, in any material respect, any other of its covenants, obligations or agreements set forth in this Agreement, which failure is not cured within thirty (30) days after written notice of such failure has been given by another party; (c) the appointment of, or a decree or order for the appointment of, a trustee, conservator, receiver or liquidator in any insolvency or similar proceedings, or a decree or order for the winding-up or liquidation of its affairs; (d) a party admits in writing its inability to pay its debts as they become due, files any petition involving any applicable insolvency or reorganization statute, makes a general assignment for the benefit of its creditors, or voluntarily suspends payment of its obligations. Termination for an Event of Default will not prejudice the non-defaulting party's exercise of any of its other rights at law or in equity. Furthermore, any party may terminate this Agreement for convenience by giving the other parties at least one hundred eighty (180) days' written notice of termination, provided however, that if such termination under this sentence would become effective on a date which occurs during the period from October 1 through December 31 of any year, then the date of effectiveness of such termination will be delayed until the January 15th immediately following delivery of such notice. Immediately upon termination of this Agreement, Agent (i) will cease to hold itself out as an agent or authorized delegate of Blackhawk CA; (ii) will remove all display materials referred to in Section 2 above; and (iii) at Agent's sole expense, return all such display materials to Distributor within ten (10) Business Days following the date of termination of this Agreement.

IN WITNESS WHEREOF, this Agreement is executed by each party, effective as of the Effective Date.

Blackhawk Network California, Inc.

By: _____
   Authorized Signature
Print Name: Talbott Roche
Title: President & CEO
Date: 6/27/12

Blackhawk Network, Inc.

By: _____
   Authorized Signature
Print Name: David E. Durant
Title: GVP
Date: 6/27/12

Duckwall-Alco Stores, Inc.

By: _____
   Authorized Signature
Print Name: Michael Smith
Title: DMM
Date: 6-25-12

Address: 401 Cottage Avenue
         Abiline, KS 67410
Fax:     785-263-7531

BLACKHAWK CONFIDENTIAL & PROPRIETARY

Exhibit A

to

Blackhawk CA Authorized Delegate Agreement

GENERAL TERMS AND CONDITIONS FOR SALE OF OPEN LOOP CARDS BY AGENT

A. **Definitions.** Unless otherwise explicitly provided, capitalized terms herein will have the meanings set forth below or elsewhere in this Agreement:

"*ACH*" means automated clearing house electronic funds transfer system.

"*Activate*" means the completed process of enabling an Open Loop Card for use for purchases or cash withdrawal from an account, such that an Open Loop Card is enabled for, and capable of, being used for purchases or cash withdrawal from an account.

"*Activation Data*" means the data necessary to Activate an Open Loop Card.

"*Affiliate*" means, with respect to a party, any person, firm, corporation, partnership, limited liability company, or other entity that now or in the future, directly controls, is controlled with or by or is under common control with a party.

"*Alliance Partner Program*" means a card marketing and distribution program and other marketing programs operated by Blackhawk or its Affiliates, as amended from time to time or discontinued in its entirety by Blackhawk in its sole discretion upon written notice to Agent.

"*Applicable Law*" means all foreign, federal, state or local laws or regulations, and any related rules, orders, published interpretations or decrees of any governmental authorities (including courts) with authority with respect thereto, including money transmission laws and regulations, applicable to the sale or Loading of prepaid stored value cards, including the Open Loop Cards.

"*Approved Store*" means individual retail outlets, websites, and telephone or other non-physical sales outlets specifically approved jointly by Blackhawk CA and Distributor to offer and sell the Open Loop Cards or otherwise engage in Authorized Delegate Services.

"*Business Day*" means Monday through Friday, inclusive, excluding federal holidays.

"*Cardholder*" means the purchaser or lawful holder of an Open Loop Card.

"*Cardholder Agreement*" means the terms and conditions of use of the Open Loop Cards between Blackhawk CA and the Cardholder, including those set forth on the Open Loop Card, in its packaging, and/or on a website of Blackhawk CA or its Affiliates.

"*Designated Account*" means Agent's demand deposit account at a financial institution approved by Blackhawk CA where title on such account reflects that funds therein are held in trust for Blackhawk CA.

"*Issuance Fee*" means the amount(s), as determined by Blackhawk CA in its sole discretion that Agent will charge on behalf of Blackhawk CA to Cardholder at the point of sale for the Activation and/or Loading of the Open Loop Cards.

"*Load*" means the initial or subsequent electronic placement of funds or value onto an Open Loop Card in any transaction.

"*Load Amount*" means that part of the Purchase Price that is the amount Loaded onto an Open Loop Card.

"*Marks*" means trademarks, service marks, trade names, designs and logos.

"*Network Rules*" means the by-laws, rules and other published operational and technical requirements of any Payment Network.

"*Participating Merchant*" means any entity that, in connection with an agreement with Blackhawk CA: (i) issues an Open Loop Card serviced by Blackhawk CA; (ii) as a program manager, authorizes Blackhawk CA to distribute and/or sell such Open Loop Cards via the Alliance Partner Program; (iii) as a participant in a Blackhawk CA reload network (via Open Loop Cards or other electronic transmission), authorizes funds to be transferred to themselves (i.e. program managers or bill payers) or to third parties (e.g. issuing banks), such third parties being "*Third Party Funds Transferees*"). The term "Participating Merchant" also includes Third Party-Funds Transferees.

"*Payment Network*" means the network established by MasterCard International, Inc., the network established by Visa USA, Inc., and/or any other any payment network in which the Open Loop Cards participate from time to time, in Blackhawk CA's discretion.

"*Processor*" means the agent or subcontractor of Blackhawk CA that provides electronic processing and customer services such as: set-up and maintenance of the Cardholder account, transaction authorization, processing, clearing and settlement, Payment Network access and compliance, Cardholder dispute resolution, regulatory compliance, security and fraud control, and activity reporting.

"*Purchase Price*" means the Load Amount of the Open Loop Card sold, plus the Issuance Fee and any other fees required by Blackhawk CA to be charged to the Cardholder at the time of sale.

B. **Certain Agent Obligations re Sales.** Agent will: (i) offer and sell Open Loop Cards only at Approved Stores and only in accordance with this Agreement and the Alliance Partner Agreement; (ii) notify customers (including by display at point of sale) of the Issuance Fee and any other information required by Applicable Law in advance of the Cardholder's purchase of the Open Loop Card or money transmission; (iii) provide customers who purchase or re-Load an Open Loop Card or engage in money transmission with all information or disclosures supplied to Agent by Blackhawk CA or Distributor; (iv) limit money transmission and sales of Open Loop Cards to one person in one transaction and to no more than the dollar amounts set forth in writing from time to time by Blackhawk CA or Distributor; (v) adhere to the policies and procedures manual and other training provided to Agent from time to time by Blackhawk CA; (vi) not issue any refund or credit, or cancel any transaction relating to money transmission or an Open Loop Card, except as approved by Blackhawk CA, and then only at Agent's sole cost and expense, with Agent remaining liable for timely payment of the applicable Purchase Price (as required under Section 3 of this Agreement); and (vii) cooperate with Distributor and Blackhawk CA to reduce and/or investigate any fraud, thefts or losses of any Open Loop Cards at Approved Stores.

C. **Card Inventory and Security.** Agent will maintain and securely store its inventory of Open Loop Cards in accordance with applicable requirements of Blackhawk CA and the Payment Networks, including all guidelines in relation to card security as published on Blackhawk CA's website and/or the Payment Network's website or otherwise made available to Agent from time to time. Agent will notify Blackhawk CA and Distributor promptly by telephone, electronic mail or facsimile of any damaged, lost, misplaced or stolen Open Loop Cards or the companion card carrier and in any event within 24 hours after it learns of such occurrence or (if earlier) should have learned of such occurrence.

D. **Cardholder Customer Service.** Blackhawk CA will provide toll-free telephone service/support to Cardholders. Agent will refer all customer service issues regarding the Open Loop Cards to Distributor, provided that Agent initially will provide "first level" support to

BLACKHAWK CONFIDENTIAL & PROPRIETARY

Cardholders at point of sale by responding to inquiries that can be answered on the basis of sales register tapes/records, and directing Cardholders to the toll-free support number. Following Activation, Blackhawk CA will be fully responsible for all other customer service and dispute resolution in connection with the Open Loop Cards, including Cardholder disputes.

E. **Use of Marks and Service.** The Open Loop Cards, physical marketing components (including card carriers and informational display materials), general promotional and marketing materials, and authorized use of the Open Loop Cards are regulated by Payment Networks and Blackhawk CA. Any use or reproduction by Agent of the Open Loop Cards Marks or the Payment Network Marks or the Blackhawk CA Marks, in any medium, is prohibited without prior written approval of Distributor. If Blackhawk CA provides consent to Distributor for use or reproduction of the Card or the foregoing Marks, it will be deemed to be consent for Agent to make limited use solely as approved. Neither Blackhawk CA nor any Agent shall (i) obtain any right, title or other interest in the Participating Merchant Marks, other than any limited license rights specifically granted to them in writing, or (ii) challenge any right, title or interest of any Participating Merchant, its Affiliates or any Open Loop Card in or to the Participating Merchant Marks.

F. **Data Security; Consumer Privacy.** Agent will establish and maintain appropriate administrative, technical and physical safeguards designed to: (i) protect the security, confidentiality and integrity of all Cardholder Information it receives, if any (as defined below); (ii) ensure against any anticipated threats or hazards to its data security and computer system integrity; (iii) protect against unauthorized access to or use of such information or associated records that could result in harm or inconvenience to any Cardholder; and (iv) ensure the proper disposal of Cardholder Information. Further, on the date required by a Payment Network, including any such date as set forth in any remediation plan for compliance approved by a Payment Network, Blackhawk CA, or any other party that is authorized as a party to Agent's card acceptance agreement with a Payment Network (as applicable), Agent will validate compliance with Distributor's and Payment Network's respective data security requirements. Nothing herein supersedes or modifies any obligations to comply with a Payment Network's information security, data security or data protection programs, or any similar program that arises under any card acceptance agreement. Agent will comply with all Applicable Law with respect to any Cardholder Information. Agent will not use or disclose to any third party any non-public personal data or any consumer's personally identifying information without Blackhawk CA's prior written consent. In the event that Agent becomes aware of any unauthorized use, modification, destruction or disclosure of, or access to, any of the foregoing information, Agent will as soon as is practicable notify Distributor (and Distributor in turn will notify Blackhawk CA). Agent will cooperate with Distributor, Blackhawk CA and any affected Payment Network to assess the nature and scope of such incident and to contain and control such incident to prevent further unauthorized access to or use of Cardholder Information. "*Cardholder Information*" means (a) all personally identifiable information and other data related to Cardholders, (b) the information collected from the Cardholder by Blackhawk CA in the process of Activating the Open Loop Cards, and (c) any changes to such information recorded by Blackhawk CA after such Open Loop Cards are Activated.

G. **Suspension of Authorized Delegate Services.** In addition to the suspension right for non-payment, Distributor and Blackhawk CA have the right to suspend Agent's services under this Agreement upon one (1) Business Days' notice in the event of any of the following (as determined by either of them in their sole discretion): (i) a material adverse change in Agent's financial condition or reasonable fears relating to Agent's ability to meet its payment obligations hereunder; (ii) sales through Agent (including its Approved Stores) would likely have a material adverse effect on customers or customer confidence in the Open Loop Cards; (iii) any failure by Agent to adhere to the compliance or training requirements or guidelines prescribed by Blackhawk CA or Distributor or to adhere to Applicable Law or to Network Rules; or (iv) excessive fraud levels in connection with sales and re-Loads of Open Loop Cards at any Approved Store.

H. **Audit.** Agent agrees that, at Blackhawk CA's or Distributor's sole discretion, each of Blackhawk CA and any affected Payment Network and their respective authorized representatives, or agents and any government entity with regulatory or supervisory authority over (x) either of them or (y) any Participating Merchant (collectively the "*Auditing Party*") has the right to inspect, audit, and examine all of Agent's and the Approved Stores' facilities, records and personnel relating to the Authorized Delegate Services at any time during normal business hours upon reasonable notice and, where provided by law, without notice. The Auditing Party has the right to make abstracts from Agent's books, accounts, data, reports, papers, and computer records directly pertaining to the performance of the Authorized Delegate Services, including Agent's sales (including re-Loads) of Open Loop Cards, as set forth in this Agreement. Agent will make all such facilities, records, personnel, books, accounts, data, reports, papers, and computer records available to the Auditing Party for the purpose of conducting such audits, inspections and examinations.

I. **Indemnification.** Agent will indemnify and hold harmless Blackhawk CA, Distributor, Participating Merchants and their respective Affiliates and their respective directors, employees, agents, subcontractors, successors and assigns, from and against any and all "*Claims*" (any claim, suit, action or proceeding by any third party) and "*Damages*" (any liability, loss, damages, costs, fines and expenses, including reasonable legal fees and expenses that result from, arise out of or relate to a Claim) arising out of or relating to (i) Agent's or Approved Stores' breach or alleged breach of this Agreement or the Alliance Partner Agreement; (ii) the unauthorized use by Agent or the Approved Stores of any Marks in connection with the sale or advertisement of the Open Loop Cards; (iii) Agent's or the Approved Stores' infringement of the rights (including, without limitation, the intellectual property rights, proprietary rights, rights to privacy and rights to publicity) of any person or entity; and (iv) the negligence, fraud or willful misconduct of Agent or the Approved Stores or their respective directors, employees, agents, subcontractors, successors and assigns. Blackhawk CA will indemnify and hold harmless Agent and its Affiliates, and their respective directors, employees, agents, successors and assigns, from and against any and all Claims and Damages arising out of or relating to (a) Blackhawk CA's breach of its obligations under this Agreement or the Program Management Agreement; (b) Blackhawk CA's infringement of the rights (including, without limitation, the intellectual property rights, proprietary rights, rights to privacy and rights to publicity) of any person or entity; and/or (c) the negligence, fraud or willful misconduct of Blackhawk CA or its directors, employees, agents, subcontractors, successors and assigns. Distributor will defend, indemnify and hold harmless Agent and its Affiliates, and their respective directors, employees, agents, successors and assigns, from and against any and all Claims and Damages to the extent arising out of or relating to (a) Distributor's breach of its obligations under this Agreement; (b) Distributor's infringement of the rights (including, without limitation, the intellectual property rights, proprietary rights, rights to privacy and rights to publicity) of any person or entity; and/or (c) the negligence, fraud or willful misconduct of Distributor or its directors, employees, agents, subcontractors, successors and assigns. The indemnity obligations set forth in this Section supplement and do not supersede those set forth in the Program Management Agreement and the Alliance Partner Agreement.

BLACKHAWK CONFIDENTIAL & PROPRIETARY

**J. LIMITATION OF LIABILITY.** EXCEPT FOR (i) CLAIMS ARISING OUT OF GROSS NEGLIGENCE, WILLFUL MISCONDUCT, OR FRAUD OF ANY PARTY, BREACH OF CONFIDENTIALITY OR CONSUMER PRIVACY OBLIGATIONS, OR BREACH OF APPLICABLE LAW OR NETWORK RULES, (ii) INDEMNIFICATION OBLIGATIONS HEREIN, OR (iii) AGENT'S PAYMENT OBLIGATIONS HEREUNDER, IN NO EVENT SHALL ANY PARTY, OR THEIR AFFILIATES, BE LIABLE TO ANY OTHER PARTY, WHETHER IN CONTRACT, TORT, EQUITY OR OTHERWISE, FOR CLAIMS ARISING FROM OR RELATING TO THE PARTIES' RESPECTIVE SERVICES PROVIDED PURSUANT TO THIS AGREEMENT, FOR AN AGGREGATE AMOUNT DURING THE TERM OF THIS AGREEMENT IN EXCESS OF THE GREATER OF (A) ONE HUNDRED THOUSAND DOLLARS ($100,000) AND (B) THE AMOUNT OF FEES EARNED BY BLACKHAWK CA DURING THE SIX-MONTH PERIOD IMMEDIATELY PRECEDING THE DATE THE CLAIM AROSE. EXCEPT TO THE EXTENT THAT SUCH DAMAGES ARE AWARDED AS PART OF AN INDEMNIFIED CLAIM, IN NO EVENT SHALL ANY PARTY BE LIABLE TO ANY OTHER PARTY, WHETHER IN CONTRACT, TORT, EQUITY OR OTHERWISE, FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, PUNITIVE OR EXEMPLARY DAMAGES, INCLUDING LOST PROFITS, (EVEN IF SUCH DAMAGES ARE FORESEEABLE AND WHETHER OR NOT A PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES) ARISING FROM OR RELATING TO THE PARTIES' RESPECTIVE SERVICES PROVIDED PURSUANT TO THIS AGREEMENT.

**K. Arbitration; Costs and Attorneys' Fees.** Any dispute under this Agreement will be resolved by one (1) arbitrator in binding arbitration conducted in Alameda County, California in accordance with the Commercial Arbitration Rules of the American Arbitration Association then in effect in the State of California. The arbitration award (the "*Award*") will be delivered to the parties in writing, specifying the factual and legal basis for the Award. The Award may be confirmed and enforced in any court of competent jurisdiction. Any party may apply to any court having jurisdiction and seek interim provisional, injunctive or other equitable relief pending resolution of the dispute. Neither the arbitrator nor any party may disclose the existence, content or results of any arbitration hereunder without the prior written consent of all parties. Costs of the arbitration will be shared equally by the parties to the arbitration. Each party will bear its own separate costs and legal and expert fees, if any. No court or arbitrator may award attorneys' fees or costs (including expert witness fees); provided that Blackhawk CA and/or Distributor may be awarded all costs and fees incurred in enforcing Agent's payment obligations or in connection with collection thereof.

**L. Governing Law.** This Agreement generally will be governed by and construed in accordance with the laws of the State of California without regard to the application of conflicts of laws principles. Notwithstanding the foregoing, the Open Loop Cards and their marketing and distribution under Distributor's Alliance Partner Program will be governed by and construed in accordance with the internal laws of the state in which they are sold, to the extent required by such laws and without regard to the application of conflicts of laws principles.

**M. Notices.** All notices and approvals required by this Agreement will be made by facsimile and in writing delivered by prepaid first class mail or nationally-recognized courier service addressed to Blackhawk CA and Distributor at the applicable address and facsimile set forth below or to Agent at the address and facsimile set forth below its signature to this Agreement; or to such other address/facsimile of a party as it provides notice in accordance with this Section. Notice will be deemed given upon the earlier of receipt of facsimile transmission during normal business hours or actual receipt of a notice by mail or courier.

| Blackhawk CA to: | Blackhawk Network California, Inc. 5918 Stoneridge Mall Rd Pleasanton, CA 94588 Attn: General Counsel Fax: (925) 226-9728 | Distributor to: | Blackhawk Network, Inc. 5918 Stoneridge Mall Rd Pleasanton, CA 94588 Attn: General Counsel Fax: (925) 226-9728 | Agent to: | As written on the signature page of the Agreement to which this exhibit is attached. |
|---|---|---|---|---|---|
| With copy to: | Blackhawk Network California, Inc. 5918 Stoneridge Mall Rd Pleasanton, CA 94588 Attn: President Fax: (925) 226-9083 | With copy to: | Blackhawk Network, Inc. 5918 Stoneridge Mall Rd Pleasanton, CA 94588 Attn: GVP - US Sales Fax: (925) 226-9083 | | |

**N. Miscellaneous.** No party may transfer or assign (by merger or operation of law or otherwise,) this Agreement or its obligations under this Agreement, in whole or in part, without the prior written consent of the other parties, such approval not to be unreasonably withheld; provided, however, that Blackhawk CA and Distributor may assign this Agreement in whole (but not in part) to any Affiliate of such party. The failure of a party to insist upon strict performance of any of the provisions contained in this Agreement will in no way constitute a waiver of its rights, at law or in equity, or a waiver of any subsequent default by the other party. The invalidity of any provision of this Agreement will not affect the validity of the remaining provisions. No consumer, Service Bureau, or any other third party, other than each Participating Merchant and its Affiliates, is a third-party beneficiary to this Agreement. This Agreement may not be changed, modified or amended except in writing and signed by all the parties. Headings used in this Agreement will not be relevant to its interpretation. This Agreement may be executed in counterparts (which execution may be by facsimile or electronically scanned), each of which is an original, but all of which constitute one and the same document.

BLACKHAWK CONFIDENTIAL & PROPRIETARY

Exhibit B
to
Blackhawk CA Authorized Delegate Agreement

STATE-SPECIFIC PROVISIONS

By continuing to accept the supply of Open Loop Cards from Blackhawk Network California, Inc. and/or its Affiliates or continuing to sell, or offer for sale, any Open Loop Cards at your selling locations, Agent, as an authorized delegate of Blackhawk Network California, Inc., certifies and agrees, as a condition of such offer and sale in the applicable States, to adhere to the following state-specific provisions.

1. ARIZONA:
(a) Agent shall prominently display at each location a notice in the form prescribed by the superintendent that indicates that the agent is an authorized delegate of Blackhawk CA under Arizona Revised Statutes, Title 6, Chapter 12.
(b) Agent acknowledges receipt of Arizona Revised Statutes, Title 6, Chapter 12, attached hereto as "Arizona Appendix to Authorized Delegate Agreement with Blackhawk Network California, Inc.," regarding transmitters of money. Agent acknowledges and agrees that such statutes may be revised unilaterally from time to time by the Arizona legislature and that Agent shall operate in full compliance with such statutes and other applicable law in Arizona, as they may be updated from time to time.
(d) Upon receipt of any notice from the superintendent that Blackhawk CA's license has been suspended or revoked or that Blackhawk CA has not renewed its license, Agent shall immediately cease to operate as a delegate of Blackhawk CA.
(d) Agent acknowledges and agrees that it is subject to examination by the superintendent at the discretion of the superintendent; and that Blackhawk CA is responsible for the payment of an assessment for such examination to the extent that the examination relates to activities conducted by Agent on behalf of Blackhawk CA.

2. ILLINOIS:
(a) Agent shall conspicuously display a disclosure notice supplied by Blackhawk CA.
(b) The disclosure notice shall contain the following information pursuant to Section 37 of the Illinois Transmitters of Money Act (the "Act") (or such other information as the Applicable Law may require from time to time):
   (1) The name of the Agent's licensee issuing the disclosure notice (i.e., Blackhawk CA).
   (2) A toll-free telephone number for the Illinois Department of Financial Institutions which will provide customer support for suspected violations of the Act.
   (3) A statement that the authorization may be revoked at any time by Blackhawk CA.
(c) An Agent who has been terminated shall remove the disclosure notice from the premises within 10 business days after such termination. A terminated Agent who willfully and knowingly refuses to remove the disclosure notice within 10 business days of termination commits a Class B misdemeanor.
(d) If a customer of a former Agent (i.e., one who has been terminated) detrimentally relies on a disclosure notice that was not removed, Agent shall be civilly liable if the customer proves:
   (1) that the former Agent possessed the disclosure notice beyond 10 business days from the termination of authorization by Blackhawk CA,
   (2) that the former Agent held itself out as an authorized Agent, without informing the customer it was no longer authorized by Blackhawk CA,
   (3) that the customer justifiably relied upon the conspicuously displayed disclosure notice formerly provided by Blackhawk CA, and
   (4) that the former Agent engaged in the business of transmitting money after its termination as an authorized Agent.
(e) As used in (d) above, "civil liability" means liability for actual loss, reasonable attorney's fees, and costs.

3. MINNESOTA:
The Commissioner may require Blackhawk CA to cancel Agent's contract as a result of a violation of section 53B.21 of the Minnesota Money Transmitters Act:

(a) Agent shall not make any fraudulent or false statement or misrepresentation to Blackhawk CA or to the commissioner.
(b) Agent shall conduct its money transmission activities in a safe and sound manner.
(c) Agent shall cooperate with an investigation conducted by the commissioner under this chapter by providing any relevant information in its possession that the commissioner cannot reasonably obtain from another source.
(d) Agent is under a duty to act only as authorized under the contract with Blackhawk CA and any agent who exceeds its authority is subject to cancellation of its contract.
(e) All funds, less fees, received by Agent from the sale or delivery of a payment instrument issued by Blackhawk CA or received by Agent for transmission, constitute trust funds owned by and belonging to Blackhawk CA from the time the funds are received by Agent until the time when the funds or an equivalent amount are remitted by Agent to Blackhawk CA. If Agent commingles any funds with other funds or property owned or controlled by Agent, all commingled proceeds and other property must be impressed with a trust in favor of Blackhawk CA in an amount equal to the amount of the proceeds due Blackhawk CA.
(f) [Intentionally omitted.]

4. NORTH CAROLINA:
(1) Blackhawk CA appoints Agent as its delegate with authority to engage in money transmission on behalf of Blackhawk CA.
(2) Neither Blackhawk CA nor Agent may authorize sub-delegates without the written consent of the North Carolina Commissioner of Banks ("*Commissioner*").
(3) Blackhawk CA is subject to supervision and regulation by the Commissioner.
(4) Blackhawk CA shall issue a certificate of authority for each location at which it conducts licensed activities in North Carolina through Agent. The certificate shall be posted in public view at each location and shall state as follows: "Money transmission on behalf of Blackhawk Network California, Inc. is conducted at this location pursuant to the Money

BLACKHAWK CONFIDENTIAL & PROPRIETARY

Transmitters Act."

5. **OHIO:**
(a) Agent acknowledges and agrees that it is subject to all applicable provisions of the Ohio Money Transmitters Law located at Ohio Revised Code, Section 1315.01 through Section 1315.99. In particular, pursuant to Section 1315.11(C) of the Code, the Ohio Superintendent of Financial Institutions may examine the books and records and policies and procedures of Agent as part of its examination of Blackhawk CA.

6. **SOUTH DAKOTA:**
(a) Blackhawk CA appoints Agent as its delegate with authority to engage in money transmission on behalf of Blackhawk CA.
(b) Neither Blackhawk CA nor Agent may authorize sub-delegates without the written consent of the director of the Division of Banking of the State of South Dakota ("*Director*").
(c) Blackhawk CA is subject to supervision and regulation by the Director.

7. **TEXAS:**
(a) (1) Agent hereby certifies that it is familiar with and agrees fully to comply with all applicable state and federal laws, rules and regulations pertaining to money transmission, including:
- Chapter 151 (*Regulation of Money Services Businesses (Title 3)*) of the Texas Finance Code and the rules adopted thereunder, including specifically the preparation and maintenance of records required thereunder or as reasonably requested by the Commissioner of the Texas Department of Banking;
- Chapter 271 (*Financial Transaction Reporting Requirements*) of the Texas Finance Code;
- relevant provisions of the federal Bank Secrecy Act; and
- relevant provisions of the federal USA PATRIOT ACT.

(2) Agent hereby acknowledges receipt of the following website addresses through which it can access the laws identified above:
- http://policy.ctspublish.com/txdob/lpext.dll/Infobase/division00060/sd100061.htm/sd200062.htm?fn=frame_default.htm&f=templates
- http://policy.ctspublish.com/txdob/lpext.dll/Infobase/division00013/sd100014.htm/sd200028.htm?f=templates&fn=content_doc.htm&q=Chapter%20271&x=advanced&2.0#LPHit1
- http://www.fincen.gov/statutes_regs/bsa/
- http://www.fincen.gov/statutes_regs/patriot/ (Full Act: http://frwebgate.access.gpo.gov/cgi-bin/getdoc.cgi?dbname=107_cong_public_laws&docid=f:publ056.107.pdf)

(3) Agent hereby acknowledges receipt of the written policies and procedures adopted by Blackhawk CA designed to ensure that Agent complies with applicable state and federal law.

(b) Agent understands that Blackhawk CA is subject to regulation by the Commissioner of the Texas Department of Banking and that, as part of that regulation, the Commissioner may suspend or revoke an Agent's authorized delegate designation or require Blackhawk CA to terminate Agent's authorized delegate designation.

(c) Notwithstanding Section 3(a) of the Authorized Delegate Agreement, and pursuant to Section 151.404(c) and 151.404(d) of the Texas Finance Code:
(i) Agent may not commingle any Load Amounts with Agent's own money or other property, except to use the Load Amounts in the ordinary course of Agent's business for the purpose of making change, if the Load Amounts are accounted for at the end of each business day; and
(ii) if any Load Amounts received by Agent are commingled with other funds or property of Agent, then until such Load Amounts are remitted to Blackhawk CA, all commingled funds and other property will be impressed with a trust in favor of Blackhawk CA in an amount equal to such commingled Load Amounts.

(d) Agent acknowledges and agrees that it must prominently display on the form prescribed by the Commissioner a notice that indicates that Agent is an authorized delegate of Blackhawk CA under Chapter 151 of the Texas Finance Code.

(e) Agent acknowledges and agrees that any assignment of this Authorized Delegate Agreement that involves any Approved Stores located in Texas must be approved by the Texas Banking Department.

(f) With reference to Section 1(a) of this Authorized Delegate Agreement, Agent acknowledges and agrees that sub-delegates are not permissible in the State of Texas.

8. **WASHINGTON:**
(a) Agent acknowledges and agrees that it must operate in full compliance with the Uniform Money Services Act, Revised Code of Washington (RCW 19.230) and the rules adopted thereunder at Washington Administrative Code (WAC §208.690).

BLACKHAWK CONFIDENTIAL & PROPRIETARY

Arizona Appendix to Authorized Delegate Agreement with Blackhawk Network California, Inc.
Arizona Revised Statutes, Title 6 Banks and Financial Institutions, Chapter 12 Transmitters of Money

Article 1 Licenses and Regulation

6-1201. Definitions

In this chapter, unless the context otherwise requires:

1. "Authorized delegate" means a person designated by the licensee under section 6-1208.
2. "Check cashing" means exchanging for compensation a check, debit card payment order, draft, money order, traveler's check or payment instrument of a licensee for money delivered to the presenter at the time and place of the presentation.
3. "Control" means ownership of fifteen per cent or more of a licensee or controlling person, or the power to vote fifteen per cent or more of the outstanding voting securities of a licensee or controlling person. For the purpose of determining the percentage controlled by any one person, that person's interest shall be aggregated with the interest of any other person controlled by that person or an officer, partner or authorized delegate of that person, or by a spouse, parent or child of that person.
4. "Controlling person" means a person directly or indirectly in control of a licensee.
5. "Engage in the business" means conducting activities regulated under this chapter more than ten times in any calendar year for compensation or in the expectation of compensation. For purposes of this paragraph, "compensation" means any fee, commission or other benefit.
6. "Foreign money exchange" means exchanging for compensation money of the United States government or a foreign government to or from money of another government at a conspicuously posted exchange rate at the time and place of the presentation of the money to be exchanged.
7. "Licensee" means a person licensed under this chapter.
8. "Location" means a place of business at which activity regulated by this chapter occurs.
9. "Money" means a medium of exchange that is authorized or adopted by a domestic or foreign government as a part of its currency and that is customarily used and accepted as a medium of exchange in the country of issuance.
10. "Money accumulation business" means obtaining money from a money transmitter as part of any activity that is carried on for financial gain if the money that is obtained by all persons acting in concert in the activity, in amounts of one thousand dollars or more, totals over fifty thousand dollars in the preceding twelve-month period. Money accumulation business does not include a person who is subject to the reporting requirements under 31 United States Code section 5313. The exception that is established by 31 United States Code section 5331, subsection (c), paragraph 1 does not apply to persons who are engaged in the money accumulation business.
11. "Money transmitter" means a person who is located or doing business in this state, including a check casher and a foreign money exchanger, and who does any of the following:
    (a) Sells or issues payment instruments.
    (b) Engages in the business of receiving money for the transmission of or transmitting money.
    (c) Engages in the business of exchanging payment instruments or money into any form of money or payment instrument.
    (d) Engages in the business of receiving money for obligors for the purpose of paying that obligor's bills, invoices or accounts.
    (e) Meets the definition of a bank, financial agency or financial institution as prescribed by 31 United States Code section 5312 or 31 Code of Federal Regulations section 103.11.
12. "Outstanding payment instruments" means unpaid payment instruments whose sale has been reported to a licensee.
13. "Payment instrument" means a check, draft, money order, traveler's check or other instrument or order for the transmission or payment of money sold to one or more persons whether or not that instrument or order is negotiable. Payment instrument does not include an instrument that is redeemable by the issuer in merchandise or service, a credit card voucher or a letter of credit.
14. "Permissible investment" means any of the following:
    (a) Money on hand or on deposit in the name of the licensee.
    (b) Certificates of deposit or other debt instruments of a bank, savings and loan association or credit union.
    (c) Bills of exchange or time drafts that are drawn on and accepted by a bank, otherwise known as banker's acceptances, and that are eligible for purchase by member banks of the federal reserve system.
    (d) Commercial paper bearing a rating of one of the three highest grades as defined by a nationally recognized organization that rates these securities.
    (e) Securities, obligations or other instruments whose payment is guaranteed by the general taxing authority of the issuer, of the United States or of any state or by any other governmental entity or any political subdivision or instrumentality of a governmental entity and that bear a rating of one of the three highest grades by a nationally recognized investment service organization that has been engaged regularly in rating state and municipal issues for at least five years.
    (f) Stocks, bonds or other obligations of a corporation organized in any state of the United States, the District of Columbia, the Commonwealth of Puerto Rico or the several territories organized by Congress that bear a rating of one of the three highest grades by a nationally recognized investment service organization that has been engaged regularly in rating corporate securities for at least five years.
    (g) Any receivable that is due to a licensee from its authorized delegate pursuant to a contract between the licensee and authorized delegate as prescribed in section 6-1208 if the amount of investment in those receivables does not exceed ninety per cent of the total amount of those receivables after subtracting the amount of those receivables that are past due or doubtful of collection.
15. "Responsible individual" means a person who is employed by a licensee and who has principal active management authority over the business of the licensee in this state that is regulated under this chapter.
16. "Trade or business" has the same meaning prescribed in section 162 of the internal revenue code of 1954 and includes the money accumulation business.
17. "Transmitting money" means the transmission of money by any means including transmissions within this country or to or from locations abroad by payment instrument, wire, facsimile internet or any other electronic transfer, courier or otherwise.
18. "Traveler's check" means an instrument identified as a traveler's check on its face or commonly recognized as a traveler's check and issued in a money multiple of United States or foreign currency with a provision for a specimen signature of the purchaser to be completed at the time of purchase and a countersignature of the purchaser to be completed at the time of negotiation.

6-1202. License required

A. A person shall not sell or issue payment instruments, engage in the business of receiving money for transmission or transmitting money, engage in the business of exchanging payment instruments or money into any form of money or payment instrument or engage in the business of receiving money for obligors for the purpose of paying that obligor's bills, invoices or accounts without first obtaining a license as provided in this chapter or becoming an authorized delegate of a licensee with respect to those activities. A licensee is under the jurisdiction of the department. A person who is not licensed under this chapter or who is not an authorized delegate of a licensee with respect to those activities is presumed to be engaged in a business that is regulated by this chapter and that requires a license if he advertises, solicits or holds himself out as being in the business of selling or issuing payment instruments, of receiving money for transmission or transmitting money or of converting one form of money to another form of money.

BLACKHAWK CONFIDENTIAL & PROPRIETARY

B. No person other than a corporation organized and in good standing under the laws of the state of its incorporation or, if a corporation organized under the laws of a country other than the United States and in good standing under the laws of the country of its incorporation and authorized to do business in this state, may apply for or be issued a license as provided in this chapter.

C. A person engages in business activity regulated by this chapter in this state if any of the following applies:

1. Conduct constituting any element of the regulated activity occurs in this state.

2. Conduct occurs outside this state and constitutes an attempt, offer or conspiracy to engage in the activity within this state and an act in furtherance of the attempt, offer or conspiracy occurs within this state.

3. As part of a business activity described by this section a person knowingly transmits money into this state or makes payments in this state without disclosing the identity of each person on whose behalf money was transmitted or payment was made.

### 6-1203. Exemptions

A. This chapter does not apply to:

1. The United States or any department or agency of the United States.

2. This state, including any political subdivision of this state.

B. This chapter does not apply to the following if engaged in the regular course of their respective businesses, except that the provisions of article 2 of this chapter apply to:

1. A bank, financial institution holding company, credit union, savings and loan association or savings bank, whether organized under the laws of any state or the United States when the term "money transmitter" is used.

2. A person who engages in check cashing or foreign money exchange and engages in other activity regulated under this chapter only as an authorized delegate of a licensee acting within the scope of the contract between the authorized delegate and the licensee.

3. A person licensed pursuant to chapter 5, 6, 7 or 8 of this title, chapter 9, article 2 of this title, chapter 12.1 of this title or title 32, chapter 9.

### 6-1204. Application for license; fees

A. Each application for a license shall be made in writing, under oath and in the form prescribed by the superintendent. The application shall contain at least the following:

1. Copies of the articles of incorporation for the applicant, a listing of all trade names or fictitious names used by the applicant and other information concerning the corporate status of the applicant.

2. The address of the applicant's principal place of business, the address of each location where the applicant intends to transact business in this state, including any branch offices, and the name and address of each location of any authorized delegates.

3. For each executive officer and director of the applicant and for each executive officer and director of any controlling person, unless the controlling person is a publicly traded company on a recognized national exchange and has assets in excess of four hundred million dollars, a statement of personal history in the form prescribed by the superintendent.

4. An identification statement for each branch manager and responsible individual including all of the following:

(a) Name and any aliases or previous names used.
(b) Date and place of birth.
(c) Alien registration information, if applicable.
(d) Employment history and residence addresses for the preceding fifteen years.
(e) Social security number.
(f) Criminal convictions, excluding traffic offenses.

5. The name and address of each authorized delegate.

6. The identity of any account in any financial institution through which the applicant intends to conduct any business regulated under this chapter.

7. A financial statement audited by a licensed independent certified public accountant.

B. Each application shall be accompanied by the nonrefundable application fee and an annual fee as prescribed in section 6-126.

### 6-1205. Bond required; conditions; notice; cancellation; substitution

A. Each application for a license shall be accompanied by and each licensee shall maintain at all times a bond executed by the licensee as principal and a surety company authorized to do business in this state as surety. The bond shall be in the amount of twenty-five thousand dollars for a licensee with five or fewer authorized delegates and locations, one hundred thousand dollars for a licensee with more than five but fewer than twenty-one authorized delegates and locations and an additional five thousand dollars for each authorized delegate and location in excess of twenty but fewer than two hundred authorized delegates and locations, to a maximum of two hundred fifty thousand dollars and an additional five thousand dollars for each authorized delegate and location in excess of two hundred authorized delegates and locations, to a maximum of five hundred thousand dollars.

B. The bond shall be conditioned on the faithful compliance of the licensee, including its directors, officers, authorized delegates and employees, with this chapter. The bond shall be payable to any person injured by the wrongful act, default, fraud or misrepresentation of the licensee, his authorized delegates or his employees or to the state for the benefit of the person injured. Only one bond is required for any licensee irrespective of the number of officers, directors, locations, employees or authorized delegates of that licensee.

C. The bond shall remain in effect until cancelled by the surety, which cancellation may be had only after thirty days' written notice to the superintendent. That cancellation does not affect any liability incurred or accrued during the thirty day period.

D. In lieu of the bond prescribed in this section, an applicant for a license or a licensee may deposit with the superintendent cash or alternatives to cash acceptable to the superintendent in the amount of the required bond. Notwithstanding section 35-155, subsection E, the principal amount of the deposit shall be released only on written authorization of the superintendent or on the order of a court of competent jurisdiction. The principal amount of the deposit shall not be released to the licensee before the expiration of five years from the first occurrence of any of the following:

1. The date of substitution of a bond for a cash alternative unless the superintendent determines in his discretion that the bond constitutes adequate security for all past, present or future obligations of the licensee. After that determination, the cash alternative may be immediately released.

2. The surrender of the license.

3. The revocation of the license.

4. The expiration of the license.

E. Notwithstanding subsections A through D of this section, if the required amount of the bond is reduced, whether by change in the number of authorized delegates or locations or by legislative action, a cash deposit in lieu of that bond shall not be correspondingly reduced but shall be maintained at the higher amount until the expiration of three years from the effective date of the reduction in the required amount of that bond unless the superintendent in his discretion determines otherwise.

### 6-1205.01. Net worth requirements

A. Each applicant for a license shall have and each licensee shall maintain at all times a net worth of at least one hundred thousand dollars, calculated according to generally accepted accounting principles.

BLACKHAWK CONFIDENTIAL & PROPRIETARY

B. Any licensee who is engaged in the business regulated under this chapter at more than one location pursuant to section 6-1207 or through authorized delegates pursuant to section 6-1208 shall have an additional net worth of fifty thousand dollars for each location or authorized delegate located in this state, as applicable, to a maximum of five hundred thousand dollars.

C. A licensee whose business conducts a total of more than five hundred thousand dollars in transactions that involve transmitting money in an amount of one thousand dollars or more during the preceding year shall maintain net worth in addition to the amounts required by subsections A and B of this section. The additional net worth shall be not less than ten per cent of the total of such transactions conducted in this state, calculated according to generally accepted accounting principles to a maximum of five hundred thousand dollars.

### 6-1206. Issuance of license; renewal

A. On the filing of a complete application, the superintendent shall investigate the financial condition and responsibility, financial and business experience, character and general fitness of the applicant. In his discretion, the superintendent may conduct an on-site investigation of the applicant, the reasonable cost of which shall be borne by the applicant. The superintendent shall issue a license to an applicant if the superintendent finds that all of the following conditions are met:

1. The applicant has complied with sections 6-1204, 6-1205 and 6-1205.01.
2. The competence, experience and integrity of the officers, directors and controlling persons and any proposed management personnel indicate that it would be in the interest of the public to permit such person to participate in the affairs of a licensee.
3. The applicant has paid the required license fee.

B. The superintendent shall approve or deny every application for an original license within one hundred twenty days after the date an application is complete, which period may be extended by the written consent of the applicant. The superintendent shall notify the applicant of the date on which the application is determined to be complete. In the absence of approval or denial of the application or consent to the extension of the one hundred twenty day period, the application is deemed approved and the superintendent shall issue the license effective as of the first business day after that one hundred twenty day period or any extended period.

C. A licensee shall pay a renewal fee as prescribed in section 6-126 on or before November 1 of each year. The renewal fee shall be accompanied by a renewal application in the form prescribed by the superintendent. A license for which no renewal fee and application have been received by November 1 shall be suspended. A licensee may renew a suspended license no later than December 1 of the year of expiration by paying the renewal fee plus one hundred dollars for each day the renewal fee and application were not received by the superintendent. A license expires on December 1 of each year, unless earlier renewed, surrendered or revoked. A license shall not be granted to the holder of an expired license or to an incorporator, director or officer of the holder of an expired license except on compliance with the requirements provided in this article for an original license.

### 6-1207. Principal and branch offices; notices

A. A licensee shall designate and maintain a principal place of business for the transaction of business regulated by this chapter. If a licensee maintains one or more places of business in this state, the licensee shall designate a place of business in this state as its principal place of business for purposes of this section. The license shall specify the address of the principal place of business and shall designate a responsible individual for its principal place of business.

B. If a licensee maintains one or more locations in this state in addition to a principal place of business, and those locations are to be under the control of the licensee and not under the control of authorized delegates as prescribed in section 6-1208, the licensee shall obtain a branch office license from the superintendent for each additional location by filing an application as required by the superintendent at the time the licensee files its license application. If branch offices are added by the licensee, the licensee shall file with the superintendent an application for a branch office license with the licensee's next quarterly fiscal report prescribed by section 6-1211. The superintendent shall issue a branch office license if the superintendent determines that the licensee has complied with the provisions of this subsection. The license shall indicate on its face the address of the branch office and shall designate a manager for each branch office to oversee that office. The superintendent may disapprove the designated manager then or at any later time if the superintendent finds that the competence, experience and integrity of the branch manager warrants disapproval. A person may be designated as the manager for more than one branch. The licensee shall submit a fee as prescribed in section 6-126 for each branch office license.

C. A licensee shall prominently display the money transmitter license in its principal place of business and the branch office license in each branch office. Each authorized delegate shall prominently display at each location a notice in a form prescribed by the superintendent that indicates that the authorized delegate is an authorized delegate of a licensee under this chapter.

D. If the address of the principal place of business or any branch office is changed, the licensee shall immediately notify the superintendent of the change. The superintendent shall endorse the change of address on the license for a fee as prescribed in section 6-126.

### 6-1208. Authorized delegates of licensee; reports

A. A licensee may conduct the business regulated under this chapter at one or more locations in this state through authorized delegates designated by the licensee.

B. Each contract between a licensee and an authorized delegate shall require the authorized delegate to operate in full compliance with the law and shall contain as an appendix a current copy of this chapter. The licensee shall provide each authorized delegate with operating policies and procedures sufficient to permit compliance by the delegate with the provisions of title 13, chapter 23 and this chapter and rules adopted pursuant to this chapter. The licensee shall promptly update the policies and procedures to permit compliance with those laws and rules.

C. An authorized delegate is not liable for any obligation imposed on its licensee by this chapter with respect to the business for which it is a delegate. On suspension or revocation of a license or the failure of a licensee to renew its license, the superintendent shall notify all delegates of the licensee who are on record with the department of the department's action. On receipt of this notice, an authorized delegate shall immediately cease to operate as a delegate of that licensee.

### 6-1209. Cease and desist orders; examinations

A. In addition to his authority under section 6-137, the superintendent may issue an order to cease and desist against a licensee, requiring the licensee to cease conducting its business through an authorized delegate and to take appropriate affirmative action, pursuant to section 6-137, if the superintendent finds that:

1. The authorized delegate has violated, is violating or is about to violate any applicable law or rule or order of the superintendent.
2. The authorized delegate has failed to cooperate with an examination or investigation by the superintendent or the attorney general authorized by this title.
3. The competence, experience, integrity or overall moral character of the authorized delegate or any controlling person of the authorized delegate indicates that it would not be in the interest of the public to permit that person to participate in the business regulated under this chapter.
4. The financial condition of the authorized delegate is such that it might prejudice the interests of the public in the conduct of the business regulated under this chapter.
5. The authorized delegate has engaged, is engaging or is about to engage in any unsafe or unsound act, practice or transaction or an act, practice or transaction that constitutes a violation of this title or of any rule or order of the superintendent.

B. Any business for which a license is required by this chapter conducted by an authorized delegate outside the scope of authority conferred in the contract between the authorized delegate and the licensee is unlicensed activity. An authorized delegate of a licensee holds in trust for the benefit of the licensee

BLACKHAWK CONFIDENTIAL & PROPRIETARY

all monies received from the sale or delivery of the licensee's payment instruments or monies received for transmission. If an authorized delegate commingles any such monies with any monies or other property owned or controlled by the authorized delegate, a trust against all commingled proceeds and other monies or property owned or controlled by the authorized delegate is imposed in favor of the licensee in an amount equal to the amount of the proceeds due the licensee.

C. An authorized delegate is subject to examination by the superintendent at the discretion of the superintendent. The licensee is responsible for the payment of an assessment for the examination of its authorized delegates to the extent that the examination relates to the activities conducted by the authorized delegate on behalf of the licensee. That assessment shall be made at the rate set by the superintendent for examination of an enterprise pursuant to section 6-125, subsection B, and payment of that assessment shall be made as prescribed by section 6-125.

### 6-1210. Suspension or revocation of licenses

The superintendent may suspend or revoke a license if the superintendent finds any of the following:

1. The licensee has made a material misstatement or suppressed or withheld information on an application for a license or any document required to be filed with the superintendent.
2. A fact or condition exists that, if it had existed or had been known at the time the licensee applied for its license, would have been grounds for denying the application.
3. The licensee is insolvent as defined in section 47-1201.
4. The licensee has violated any provision of title 13, chapter 23, this chapter or rules adopted pursuant to this chapter or any order of the superintendent.
5. An authorized delegate of the licensee has violated any provision of title 13, chapter 23, this chapter or rules adopted thereunder or any order of the superintendent as a result of a course of negligent failure to supervise or as a result of the wilful misconduct of the licensee.
6. The licensee refuses to permit the superintendent or the attorney general to make any examination authorized by this title.
7. The licensee knowingly fails to make any report required by this chapter.
8. The licensee fails to pay a judgment entered in favor of a claimant, plaintiff or creditor in an action arising out of the licensee's business regulated under this article within thirty days after the judgment becomes final or within thirty days after expiration or termination of a stay of execution or other stay of proceedings, whichever is later. If execution on the judgment is stayed by court order, operation of law or otherwise, proceedings to suspend or revoke the license for failure of the licensee to comply with that judgment may not be commenced by the superintendent under this subsection until thirty days after that stay.
9. The licensee has been convicted in any state of a felony or of any crime involving a breach of trust or dishonesty.

### 6-1211. Reports

Each licensee shall file with the superintendent within forty-five days after the end of each fiscal quarter a consolidated financial statement including a balance sheet, income and expense statements and a list of all authorized delegates, branch managers, responsible individuals and locations within this state that have been added or terminated by the licensee within the fiscal quarter. Information regarding branch managers and responsible individuals shall include the information prescribed in section 6-1204, subsection A, paragraph 4. For locations and authorized delegates, the licensee shall include the name and street address of each location and authorized delegate.

### 6-1212. Permissible investments

A. Every licensee shall maintain at all times permissible investments that comply with either of the following:
1. A market value computed in accordance with generally accepted accounting principles of not less than the aggregate amount of all of its outstanding payment instruments.
2. A net carrying value computed in accordance with generally accepted accounting principles of not less than the aggregate amount of all of its outstanding payment instruments, provided the market value of these permissible investments is at least ninety-five per cent of the net carrying value.

B. Notwithstanding any other provision of this chapter, the superintendent, with respect to any particular licensee or all licensees, may limit the extent to which any class of permissible investments as defined in section 6-1201 may be considered a permissible investment, except for money and certificates of deposit. The superintendent may by rule prescribe or by order allow other types of investments which the superintendent determines to have substantially equivalent safety as other permissible investments to be considered a permissible investment under this chapter.

### 6-1213. Records

A. Each licensee shall keep and use in its business books, accounts and records in accordance with generally accepted accounting principles that will enable the superintendent to determine whether that licensee is complying with the provisions of this chapter. Each licensee and authorized delegate shall preserve its records for at least five years after making the final entry on any transaction. Each authorized delegate shall keep records as required by the superintendent.

B. For each authorized delegate, the licensee shall maintain records that demonstrate that the licensee conducted a reasonable background investigation of each authorized delegate. A licensee shall preserve those records for at least five years after the authorized delegate's most recent designation by the licensee. For an authorized delegate designated after November 1, 1991, the records shall be available at all times, and for an authorized delegate designated on or before November 1, 1991, the records shall be available at all times after November 1, 1992.

C. The records of the licensee regarding the business regulated under this chapter shall be maintained at its principal place of business or, with notice to the superintendent, at another location designated by the licensee. If the records are maintained outside this state, the superintendent may require that the licensee make those records available to the superintendent at his office not more than five business days after demand. The superintendent may further require that those records be accompanied by an individual who is available to answer questions regarding those records and the business regulated under this chapter. The superintendent may require the appearance of a specific individual or may request the licensee to designate an individual knowledgeable with regard to the records and the business. The individual appearing with the records shall be available to the superintendent for up to three business days.

D. On-site examinations of records prescribed by this chapter may be conducted in conjunction with representatives of other state agencies or agencies of another state or of the federal government as determined by the superintendent. In lieu of an on-site examination, the superintendent may accept the examination report of an agency of this state or of another state or of the federal government or a report prepared by an independent licensed certified public accountant. Joint examination or acceptance of an examination report shall not be deemed a waiver of examination assessments provided by law, and joint reports and reports accepted under this subsection are considered an official report of the department for all purposes. Information obtained by examinations prescribed by this article shall be disclosed only as provided in section 6-129.

### 6-1214. Liability of licensees

Each licensee is liable for the payment of all moneys covered by payment instruments that it sells or issues in any form in this state whether directly or through an authorized delegate and whether as a maker or drawer or as money received for obligors or for transmission by any means whether or not that instrument is a negotiable instrument under the laws of this state.

### 6-1215. Notice of source of instrument; transaction records

A. Every payment instrument sold by a licensee directly or through an authorized delegate shall bear the name of the licensee and a unique consecutive number clearly stamped or imprinted on it.

BLACKHAWK CONFIDENTIAL & PROPRIETARY

B. For every transaction involving the receipt of money from a customer, the licensee or authorized delegate who receives the money shall maintain written records of the transaction. The records may be reduced to computer or other electronic medium. The records collectively shall contain the name of the licensee, the street address of the location where the money was received, the name and street address of the customer if reported to the licensee or authorized delegate, the approximate date of the transaction, the name or other information from which, together with other contemporaneous records, the superintendent can determine the identity of those employees of the licensee or authorized delegate who may have conducted the transaction and the amount of the transaction. The information required by this section shall be available through the licensee or authorized delegate who received the money for at least five years from the date of the transaction.

### 6-1216. Acquisition of control

A. A person shall not directly or indirectly acquire control of a licensee or controlling person without the prior written approval of the superintendent, except as otherwise provided by this section.

B. An application for approval to acquire control of a licensee shall be in writing in a form prescribed by the superintendent and shall be accompanied by information as the superintendent may require. The application shall be accompanied by the fee prescribed in section 6-126. The superintendent shall act on the application within one hundred twenty days after the date on which the application is complete, unless the applicant consents in writing to an extended period. An application that is not denied or approved within that period shall be deemed approved as of the first business day after the expiration of that period.

C. The superintendent shall deny the application to acquire control of a licensee if he finds that the acquisition of control is contrary to law or determines that disapproval is reasonably necessary to protect the interest of the public. In making that determination, the superintendent shall consider both of the following:

1. Whether the financial condition of the person that seeks to control the licensee might jeopardize the financial condition of the licensee or prejudice the interests of the public in the conduct of the business regulated under this chapter.

2. Whether the competence, experience, integrity and overall moral character of the person that seeks to control the licensee, or the officers, directors and controlling persons of the person that seeks to control the licensee, indicate that it would not be in the interest of the public to permit that person to control the licensee.

D. Nothing in this section prohibits a person from negotiating or entering into agreements subject to the condition that the acquisition of control will not be effective until approval of the superintendent is obtained.

E. This section does not apply to any of the following persons or transactions:

1. A registered dealer who acts as an underwriter or member of a selling group in a public offering of the voting securities of a licensee or controlling person of a licensee.

2. A person who acts as proxy for the sole purpose of voting at a designated meeting of the security holders of a licensee or controlling person of a licensee.

3. A person who acquires control of a licensee or controlling person of a licensee by devise or descent.

4. A person who acquires control of a licensee or controlling person as a personal representative, custodian, guardian, conservator, trustee or any other officer appointed by a court of competent jurisdiction or by operation of law.

5. A pledgee of a voting security of a licensee or controlling person who does not have the right, as pledgee, to vote that security.

6. A person or transaction that the superintendent by rule or order exempts in the public interest.

F. Before filing an application for approval to acquire control, a person may request in writing a determination from the superintendent as to whether that person will be deemed in control on consummation of a proposed transaction. If the superintendent determines in response to that request that the person will not be in control within the meaning of this chapter, the superintendent shall enter an order to that effect and the proposed transaction is not subject to the requirements of this section.

### 6-1217. Appointment of superintendent as agent for service of process; forwarding of process; consent to jurisdiction

A. A licensee, an authorized delegate or a person who knowingly engages in business activities that are regulated under this chapter with or without filing an application is deemed to have done both of the following:

1. Consented to the jurisdiction of the courts of this state for all actions arising under this chapter.

2. Appointed the superintendent as his lawful agent for the purpose of accepting service of process in any action, suit or proceeding that may arise under this chapter.

B. Within three business days after service of process upon the superintendent, the superintendent shall transmit by certified mail copies of all lawful process accepted by the superintendent as an agent to that person at its last known address. Service of process shall be considered complete three business days after the superintendent deposits the copies of the documents in the United States mail.

### 6-1218. Prohibited transactions

A person shall not engage in conduct requiring a license under this chapter as an authorized delegate of a principal if that principal is not licensed under this chapter. A person who does so shall be deemed to be the principal seller, issuer or actor, and not merely an authorized delegate, and is liable to the holder, remitter or customer as the principal.

## Article 2 Money Laundering

### 6-1241. Reports to the attorney general; investigation; violation; classification

A. Within thirty days after any transaction or series or pattern of transactions that is conducted or attempted by, at or through the business and that involves or aggregates five thousand dollars or more in funds or other assets, each licensee and authorized delegate of a licensee and each money transmitter shall file with the attorney general's office in a form prescribed by the attorney general a report of the transaction or series or pattern of transactions if the licensee, authorized delegate or money transmitter knows, suspects or has reason to suspect that the activity either:

1. Involves funds that are derived from illegal activities, is intended or conducted in order to hide or disguise funds or other assets that are derived from illegal activities, including, without limitation, the ownership, nature, source, location or control of the funds or other assets, as part of a plan to violate or evade any law or regulation or to avoid any transaction reporting requirement under this chapter or may constitute a possible money laundering violation under section 13-2317 or another racketeering violation as defined in section 13-2301.

2. Has no business or apparent lawful purpose or is not the sort of activity in which the particular customer would normally be expected to engage and the licensee, authorized delegate or money transmitter knows of no reasonable explanation for the activity after examining the available facts, including the background and possible purpose of the activity.

B. A licensee, authorized delegate or money transmitter that is required to file a report regarding business conducted in this state pursuant to the currency and foreign transactions reporting act (31 United States Code sections 5311 through 5326, including any special measures that are established under 31 United States Code section 5318A, and 31 Code of Federal Regulations part 103 or 12 Code of Federal Regulations section 21.11) shall file a duplicate of that report with the attorney general.

C. All persons who are engaged in a trade or business and who receive more than ten thousand dollars in money in one transaction or who receive more than ten thousand dollars in money through two or more related transactions shall complete and file with the attorney general the information required by 31 United States Code section 5331 and the federal regulations relating to this section concerning reports relating to cash received in trade or business.

BLACKHAWK CONFIDENTIAL & PROPRIETARY

D. A licensee, authorized delegate or money transmitter that is regulated under the currency and foreign transactions reporting act (31 United States Code section 5325 and 31 Code of Federal Regulations part 103) and that is required to make available prescribed records to the secretary of the United States department of treasury on request at any time shall follow the same prescribed procedures and create and maintain the same prescribed records relating to each transaction.

E. In addition to the requirements under subsection D of this section and in connection with each transaction that involves transmitting money in an amount of one thousand dollars or more, whether sending or receiving, a licensee or, for transactions conducted through an authorized delegate, an authorized delegate shall retain a record of each of the following:

1. The name and social security or taxpayer identification number, if any, of the individual presenting the transaction and the person and the entity on whose behalf the transaction is to be effected.
2. The type and number of the customer's verified photographic identification, as described in 31 Code of Federal Regulations section 103.28.
3. The customer's current occupation.
4. The customer's current residential address.
5. The customer's signature.

F. Subsection E of this section does not apply to transactions by which the licensee's customer is making a bill payment either to a commercial creditor pursuant to a contract between the licensee and the commercial creditor or to a utility company.

G. Each licensee shall create records that reflect the provision of updated operating policies and procedures pursuant to section 6-1208, subsection B and of instruction that promotes compliance with this chapter, title 13, chapter 23 and 31 United States Code section 5318, including the identification of the provider and the material and instruction that were provided.

H. On request of the attorney general, a county attorney or the superintendent, a licensee, authorized delegate or money transmitter shall make any records that are created pursuant to this section available to the attorney general, a county attorney or the superintendent at any time.

I. A licensee or, for transactions conducted through an authorized delegate, an authorized delegate shall maintain any customer identification records that are created pursuant to subsection E of this section for three years. After three years, the licensee or, for transactions conducted through an authorized delegate, the authorized delegate shall deliver the customer identification records to the attorney general. The attorney general shall make the records available on request to the superintendent or a county attorney but shall not otherwise distribute the customer identification records without a court order. The customer identification records shall not be used for any purpose other than for criminal and civil prosecution and the prevention and detection of fraud and other criminal conduct.

J. If the superintendent or the attorney general finds that reasonable grounds exist for requiring additional record keeping and reporting in order to carry out the purposes of this chapter and to prevent the evasion of this chapter, the superintendent or the attorney general may:

1. Issue an order requiring any group of licensees, authorized delegates or money transmitters in a geographic area to do any of the following:
(a) Obtain information regarding transactions that involve total dollar amounts or denominations of five hundred dollars or more, including the names of any persons participating in those transactions and any persons or entities on whose behalf they are to be effected.
(b) Maintain records of that information for at least five years and make those records available to the attorney general and the superintendent.
(c) File a report with the attorney general and the superintendent regarding any transaction in the manner prescribed in the order.
2. Issue an order exempting any group of licensees or authorized delegates from the requirements of subsection E of this section based on the geographic area, the volume of business conducted, the record of compliance with the reporting requirements of this chapter and other objective criteria.

K. An order issued pursuant to subsection J of this section is not effective for more than one hundred eighty days unless renewed after finding that reasonable grounds exist for continuation of the order.

L. The timely filing of a report required by this section with the appropriate federal agency shall be deemed compliance with the reporting requirements of this section, unless the attorney general has notified the superintendent that reports of that type are not regularly and comprehensively transmitted by that federal agency to the attorney general.

M. This chapter does not preclude a licensee, authorized delegate, money transmitter, financial institution or person engaged in a trade or business from instituting contact with and disclosing customer financial records to appropriate state or local law enforcement agencies if the licensee, authorized delegate, money transmitter, financial institution or person has information that may be relevant to a possible violation of any criminal statute or to the evasion or attempted evasion of any reporting requirement of this chapter.

N. A licensee, authorized delegate, money transmitter, financial institution, person engaged in a trade or business or director, officer, employee, agent or authorized delegate of any of them that keeps or files a record as prescribed by this section, that communicates or discloses information or records under subsection M of this section or that requires another to make any such disclosure is not liable to any person under any law or rule of this state or any political subdivision of this state or under any contract or other legally enforceable agreement, including any arbitration agreement, for the disclosure or for the failure to provide notice of the disclosure to the person who is the subject of the disclosure or to any other person who is identified in the disclosure. This subsection shall be construed to be consistent with 31 United States Code section 5318(g)(3).

O. The attorney general may report any possible violations indicated by analysis of the reports required by this chapter to any appropriate law enforcement agency for use in the proper discharge of its official duties. If an officer or employee of this state or any political subdivision of this state receives a report pursuant to 31 United States Code section 5318(g), the report shall be disclosed only as provided in 31 United States Code section 5318(g). A person who releases information received pursuant to this subsection except in the proper discharge of official duties is guilty of a class 2 misdemeanor.

P. The requirements of this section shall be construed to be consistent with the requirements of the currency and foreign transactions reporting act (31 United States Code sections 5311 through 5326 and federal regulations prescribed under those sections) unless the context otherwise requires.

Q. A person who refuses to permit any lawful investigation by the superintendent, a county attorney or the attorney general or who refuses to make records available to the superintendent, a county attorney or the attorney general pursuant to subsection H of this section is guilty of a class 6 felony.

**6-1242. Investigations**

A. The attorney general may conduct investigations within or outside this state to determine if a licensee, authorized delegate, money transmitter, financial institution or person engaged in a trade or business has failed to file a report required by this article or has engaged or is engaging in an act, practice or transaction that constitutes a money laundering violation as provided in section 13-2317.

B. On request of the attorney general, all licensees, authorized delegates, money transmitters and financial institutions shall make their books and records available to the attorney general during normal business hours for inspection and examination in connection with an investigation pursuant to this section.