

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed July 24, 2015**

_United States Bankruptcy Judge_

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **ALCO STORES, INC.,** | § | **CASE NO. 14-34941-SGJ-11** |
| Debtor. | § | (Chapter 11) |

_____

| | | |
|---|---|---|
| **BLACKHAWK NETWORK, INC., and** | § | |
| **BLACKHAWK NETWORK** | § | |
| **CALIFORNIA, INC.,** | § | |
| Plaintiffs, | § | |
| v. | § | **ADVERSARY NO. 15-03005** |
| | § | |
| **ALCO STORES, INC.,** | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER GRANTING DEBTOR-DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DE # 6]

1

## I.     INTRODUCTION

*"Just as medieval alchemists bent all their energies to discovering a formula that would transmute dross into gold, so too do modern creditors' lawyers spend prodigious amounts of time and effort seeking to convert their clients' general, unsecured claims against a bankruptcy debtor into something more substantial."*[1]

The above words, penned by Judge Carolyn King more than twenty years ago, seem fitting today in the above-referenced adversary proceeding (the "Adversary Proceeding").

The subject of this Adversary Proceeding is *stored value cards* ("*SVCs*") that can be purchased by consumers at retail establishments.  In other words, either (a) debit cards issued by financial institutions, or (b) gift cards issued by third-party retailers, which consumers select off a display rack at a retail establishment (a "Retail Store"), request the store cashier to load with a specific monetary amount (with the customer paying such amount to the cashier), and then later redeem (*i.e.,* use the value stored thereon) at a retail establishment that participates in the particular card redemption program (a "Participating Vendor").  The relevant parties in this dispute are: (1) a Retail Store (which filed a Chapter 11 bankruptcy case and happened to be indebted to a secured bank lender with a perfected, valid lien on all of the Retail Store's assets), and (2) a distributor of the SVCs (which distributor served in a sort of "middleman" role between the Retail Store and Participating Vendors).  To be clear, the gift cards at issue in this Adversary Proceeding were not for usage at the Debtor's Retail Stores; the Debtor was merely a seller of these SVCs at its various Retail Store locations and, when a customer purchased an SVC, it was acquiring value (a) to be used at the location of a third party Participating Vendor (*e.g.,* Bed Bath & Beyond or Kohl's) or (b) that was being provided by a financial institution unrelated to the Debtors.  The distributor did not get paid by the Retail Store for a large number of SVCs that the

---

[1] *Haber Oil Co. v. Swinehart (In re Haber Oil Co.)*, 12 F.3d 426, 431 (5th Cir. 1994) (Judge C. King).

Retail Store sold prepetition (more than $800,000 worth). The legal question presented in this Adversary Proceeding is two-fold and pertains to so-called ***"state money transmitter statutes"*** (which the parties agree apply to all of the SVCs involved in this dispute). The state money transmitter statutes, which are similar, in pertinent part, from state-to-state: (a) not only appear to impose an ***express trust*** in favor of a distributor of SVCs on sale proceeds attributable to the SVCs, but (b) also purport to expand the trust *res* to other property of the seller of SVCs, whenever SVC sale proceeds are commingled with other assets of the Retail Store. The distributor argues that the money transmitter statutes create a floating trust concept—imposing a floating trust or lien on all ***general assets*** of the Retail Store/seller (not merely the commingled batch of assets), until the distributor is paid in full. Moreover, the distributor argues that the state money transmitter statutes ***dispense with the need for any tracing.*** The distributor analogizes the state money transmitter statutes to the federal Perishable Agricultural Commodities Act ("PACA")[2] and the Packers and Stockyards Act ("PASA")[3] statutes, which have a similar concept of a floating lien or trust—which applies at least to assets that were commingled with or derivative from assets delivered to a debtor—and which have been widely interpreted by courts as dispensing with the need for tracing.

Thus, the first legal issue with which the court is confronted is whether these state money transmitter laws really result in a floating trust or lien on ***all general assets*** of a Retail Store (here, the Debtor) when there has been commingling of SVC sale proceeds or ***merely on a commingled batch*** of assets? This court interprets the state money transmitter statutes ***to only create a floating trust or lien as to assets in a commingled batch*** (*i.e.,* the trust would have

---

[2] *See* 7 U.S.C. § 499e(c) (2015).

[3] *See* 7 U.S.C. § 197(b) (2015).

3

attached only to the SVC sale proceeds and the other funds in the commingled account into which the SVC funds were deposited)–not on all of the general assets of the Retail Store.

Second, even if the state money transmitter statutes do create a floating trust or lien on a wider pool of general assets, the statutes cannot be applied in bankruptcy so as to dispense with the need for tracing. The concept of tracing, when constructive or express trusts are involved in bankruptcy cases, is generally necessary, so as not to contravene the Bankruptcy Code's priority provisions. Congress has specifically mandated how bankruptcy estate assets will be distributed to creditors. The general rule in bankruptcy, with regard to trusts, is that the beneficiary of the trust must be able to prove a particular fund is, in fact, its trust corpus/*res* (and, in the case of commingling, this requires tracing and application of the lowest intermediate balance rule). This ensures that non-trust assets will be distributed in accordance with the Bankruptcy Code's priority system. Courts should only deviate from the requirement of tracing when ***legislatures and reality*** make it clear that tracing is practically impossible or undesirable—such as in the case of mutating goods (*i.e.,* perishable produce that gets mixed in a batch and processed with that of many growers; poultry and meat that get carved up into an unrecognizable state and packaged; raw milk that gets transmuted into cream and condensed milk; grapes transformed in the wine-making process, *etc.*). Monetary funds collected by a retail store are not a mutating product. Because ***the commingled batch of assets no longer even existed*** at the time this Adversary Proceeding was commenced (*i.e.,* a bank account into which SVC sale proceeds were deposited was dissipated down to $0 long before this Adversary Proceeding was ever filed), the distributor's trust corpus was exhausted. The end result here is that the distributor is entitled to no more than unsecured creditor status in the above-referenced bankruptcy case.

## II.    JURISDICTION, PARTIES, PROCEDURAL POSTURE AND SUMMARY OF ARGUMENTS

1.    Bankruptcy subject matter jurisdiction exists in this Adversary Proceeding pursuant to 28 U.S.C. § 1334.  This is a statutory core proceeding, pursuant to 28 U.S.C. §157(b)(2)(A), (B), and (O); thus, the bankruptcy court has statutory authority to enter a final order.  Moreover, the court has determined that it has Constitutional authority to enter a final order in this matter as well, since it involves a dispute that can only arise in a bankruptcy case (*i.e.,* a determination as to whether property should be declared property of the bankruptcy estate).  Additionally, the parties in this matter have both consented to entry of a final order by this court.[4]  Finally, venue is proper before this court, pursuant to 28 U.S.C. §§ 1408 and 1409.

2.    The Adversary Proceeding was filed on January 22, 2015—approximately three months  after the entity known as Alco Stores, Inc. ("Alco," the "Debtor," or the "Defendant") and its wholly owned subsidiary ALCO Holdings, LLC (collectively, the "Debtors") each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors filed their Chapter 11 bankruptcy cases, which were administratively consolidated (the "Bankruptcy Case"), on October 12, 2014 (the "Petition Date").

3.    The Debtor was founded in the year 1901 in Abilene, Kansas, and was a general merchandising retailer (offering consumables and commodities, electronics, furniture, hardware, housewares, clothing, sporting goods, toys, health and beauty aids, *etc.*).  It operated approximately 198 Retail Stores in 23 states (32 of which Retail Stores were in Texas) as of the date that it filed Chapter 11.

---

[4] *Wellness Intern. Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1949 (2015); *see also Stern v. Marshall*, 131 S. Ct. 2594, 2611 (2011); *Exec. Benefits Ins. Agency v. Arkinson*, 134 S. Ct. 2165, 2171-72 (2014).

4. The Plaintiffs in this Adversary Proceeding are Blackhawk Network, Inc. and Blackhawk Network California, Inc. (collectively, "Blackhawk"). Blackhawk is essentially a middleman-distributor of the SVCs, described earlier. Some of the SVCs at issue are in the nature of debit cards issued by third-party financial institutions. Others of the SVCs are in the nature of "gift cards" issued by various third party retailers—which Alco customers, as mentioned earlier, could select off of display racks at the Debtor's Retail Stores, request the store cashier load with a specific monetary amount (paying such amount to the Debtor), and then later redeem with a Participating Vendor. To reiterate, these were not "Alco" gift cards; the Debtor was a seller of these SVCs at its various Retail Store locations and, when a customer purchased an SVC, it was acquiring value (a) to be used with some other retail establishment (*e.g.,* Bed Bath & Beyond or Kohl's) or (b) that was being provided by a financial institution unrelated to the Debtors.

5. This Memorandum Opinion is the ruling on a Motion for Summary Judgment now pending before the court that was filed by the Debtor, arguing that it is entitled to judgment as a matter of law on all counts of Blackhawk's Adversary Complaint.[5]

---

[5] With regard to the Motion for Summary Judgment, the court specifically refers to:

- Motion for Summary Judgment Seeking Dismissal of Plaintiffs' Adversary Complaint for Declaratory Judgment and Related Relief [DE # 6 in the Adversary Proceeding] and Brief in Support [DE # 7 in the Adversary Proceeding] (collectively, the "Motion for Summary Judgment");

- Blackhawk's Response in Opposition to Debtor's Motion for Summary Judgment [DE # 15 in the Adversary Proceeding] (the "Response"); and

- Reply Memorandum in Further Support of Defendant ALCO Stores, Inc.'s Motion for Summary Judgment Seeking Dismissal of Plaintiffs' Adversary Complaint for Declaratory Judgment and Related Relief [DE # 18 in the Adversary Proceeding] (the "Reply").

References to "DE # __ in the Adversary Proceeding" herein refer to the docket entry number at which a pleading appears in the docket maintained by the Bankruptcy Court Clerk in the Adversary Proceeding. References to "DE # __ in the Bankruptcy Case" herein refer to the docket entry number at which a pleading appears in the docket maintained by the Bankruptcy Court Clerk in the Bankruptcy Case.

6.      As later explained in more detail, the Debtor entered into various prepetition agreements with Blackhawk, which, among other things, required the Debtor to account for all SVC sales and card activations, and then remit the sale proceeds, less the Debtor's service or commission fees, to Blackhawk.  Two of the prepetition agreements contained language establishing that the Debtor had no legal or equitable interest in any of the SVC sale proceeds, beyond the minimal amount which Debtor was entitled to retain as payment for its service fees or commissions.  These same two prepetition agreements also referenced and purported to incorporate certain state statutes governing sales of financial instruments, including debit cards (the "State Money Transmitter Laws"), and expressly named the Debtor as Blackhawk's authorized delegate for purposes of applying those laws.  Blackhawk argues that, under these State Money Transmitter Laws, an authorized delegate is deemed to hold proceeds from the sales of financial instruments (less applicable service fees) in trust for its principal, from the moment of receipt, and is required to remit sale proceeds to its principal immediately or within a reasonable amount of time.   Thus, Blackhawk argues, the Debtor was to hold the SVC sale proceeds in trust for Blackhawk and then turnover such funds to Blackhawk upon receipt.  The reality was that no separate account was ever established by the Debtor for the SVC sale proceeds. The Debtor, in the regular course of its business, allowed SVC sale proceeds to be commingled with other funds in its master operating account, which was swept daily by the Debtor's secured lender, Wells Fargo.  This was never a problem until shortly before the bankruptcy filing, because the Debtor always managed to pay its obligations to Blackhawk (by either requesting that its lender Wells Fargo leave back certain funds before applying amounts to the Debtor's obligations under its revolving credit facility with Wells Fargo, or by the Debtor

drawing down on the Wells Fargo facility to pay Blackhawk). However, in the cash flow crises leading up to bankruptcy (*i.e.,* in the 19 days before the bankruptcy), exactly $820,538.18 in SVC sale proceeds that were owed to Blackhawk prepetition were (to use the Debtor's words) caught up in Wells Fargo sweeps of the Debtor's master operating account and "were not contained in the Debtor's coffers" so as to turn over such funds to Blackhawk.

7.      As a result of the Debtor violating the terms of its prepetition agreements with Blackhawk, Blackhawk filed the instant Adversary Proceeding, which seeks a declaratory judgment that: (a) the $820,538.18 of swept SVC sale proceeds were not property of the Debtor's bankruptcy estate pursuant to section 541(d) of the Bankruptcy Code (*i.e.,* the property was "property of Blackhawk and its network providers"); and (b) the commingling and failure to remit the SVC sale proceeds to Blackhawk results in a statutory trust in favor of Blackhawk, ***resulting in a lien on all of Debtor's property in the total amount of SVC sale proceeds that were subject to remittance*** (*i.e.,* a floating lien that reaches the Debtor's existing cash, even though such cash resulted from funds obtained postpetition by the Debtor from the sale of its personal and real property,[6] not from the sale of the SVCs—arguing that various State Money Transmitter Laws operate to impose a lien on the Debtor's assets beyond what is traceable to the SVC sale proceeds). Further, to the extent the court grants Blackhawk this declaratory relief, Blackhawk has also requested that this court order the Debtor to immediately turn over $820,538.18, in full satisfaction of Blackhawk's alleged lien for the value of SVC sale proceeds which the Debtor was allegedly required to hold in trust.

8.      For the reasons articulated below, the court concludes, based on the undisputed summary judgment evidence, that Blackhawk does ***not*** have a viable claim against any of the

---

[6] The Debtor ultimately sold substantially all of its assets during this case.

Debtor's existing cash or assets (it has, at best, a mere unsecured claim); that summary judgment should be granted in favor of the Debtor; and that Blackhawk's Adversary Complaint should be dismissed.

### III.    THE UNDISPUTED SUMMARY JUDGMENT EVIDENCE[7]

### a.  The SVCs and Related Blackhawk Agreements

9.    Alco's Retail Stores displayed, sold, activated and loaded with monetary amounts SVCs that were distributed to the Debtor by Blackhawk.[8]  Customers could then use or redeem the SVCs through a network of Participating Vendors.[9]  "Cardholder Funds" is the defined term that the parties have used in court pleadings, as well as in their prepetition agreements, to refer to the monetary amounts loaded onto the SVCs.  The court sometimes uses the term "SVC sale proceeds" to refer to these same amounts.  Why?  Because the term "Cardholder Funds" seems a little confusing in the context of this dispute.  To be clear, the consumers (*i.e.,* the cardholders) who purchased these SVCs—as far as the court is aware, from the presentations of the parties— have received the value associated with the cards.  It is the sale proceeds from the SVCs that the Debtor collected and never turned over to middleman Blackhawk that are in controversy.  In other words, it is Blackhawk that has been left "holding the bag,"[10] so to speak, in this controversy—not the consumers who purchased the SVCs.

---

[7] Note that, in determining the merits of the Motion for Summary, the court also has discretion to take judicial notice of all documents filed with this court in the Adversary Proceeding.  *See Goldberg v. Craig (In re Hydro-Action, Inc.)*, 341 B.R. 186, 188 (Bankr. E.D. Tex. 2006) (citing Fed. R. Evid. 201(b), (f)).

[8] See the Motion for Summary Judgment, Ex. B, Juniper Dec., ¶ 5.

[9] *Id.*

[10] An empty bag, as it were.

10. There were two general types of SVCs that Blackhawk distributed to the Debtor for customer purchase: (a) "Open Loop" SVCs, which were cards that were unrestricted in terms of retail location usage; and (b) "Closed Loop" SVCs, which were the retailer-branded cards, which were restricted in use to a particular retailer's store locations.[11] It appears to the court from the undisputed evidence (*i.e.,* the agreements among the parties described below), that "Open Loop" SVCs were mostly in the nature of ***debit cards*** issued by financial companies, and "Closed Loop" SVCs were mostly in the nature of ***gift cards*** issued by third-party Participating Vendors (*e.g.,* Bed Bath & Beyond, Kohl's) or phone cards or kits.

11. There were three agreements (collectively, the "Agency Agreements") between the Debtor and Blackhawk regarding the sales of the SVCs at the Debtor's Retail Stores:[12] (a) the Green Dot Agency Agreement (undated),[13] (b) the Authorized Delegate Agreement (dated June 14, 2012),[14] and (c) the U.S. Alliance Partner Agreement (dated June 6, 2012).[15] The Green Dot Agency Agreement and Authorized Delegate Agreement pertained to the Open Loop SVCs (*i.e.,* the debit-card type products). The U.S. Alliance Partner Agreement pertained to the Closed Loop SVCs (*i.e.,* the gift-card type products). Pursuant to all three agreements, it was contemplated that the Debtor would remit all Cardholder Funds (*i.e.,* the SVC sale proceeds),

---

[11] *Id.*

[12] *Id.* at ¶ 6; *see also* Exhibits 1-1 through 1-3 to the Plaintiffs' Adversary Complaint for Declaratory Judgment and Related Relief (the "Adversary Complaint") [DE # 1 in the Adversary Proceeding].

[13] Parties to this agreement were the Debtor, Blackhawk, Green Dot Corporation and Green Dot Bank (collectively, "Green Dot"). Green Dot is not a party in this litigation but appears, from this agreement, to have been the underlying financial company that issued and settled the debit cards and reload packages that the Debtor was selling.

[14] Parties to this agreement were simply the Debtor and Blackhawk.

[15] Parties to this agreement were simply the Debtor and Blackhawk.

less an applicable service fee, to Blackhawk in accordance with the remittance schedules contained therein.[16]

12.     The Green Dot Agency Agreement and the Authorized Delegate Agreement (which, again, pertained to the Open Loop SVCs), expressly provided for the creation of trusts—(a) in the case of the Green Dot Agency Agreement, a trust for the benefit of ***cardholders*** (although at one point referring to the ultimate card issuer Green Dot as having ultimate ownership of the Cardholder Funds), and (b) in the case of the Authorized Delegate Agreement, a trust for the benefit of ***Blackhawk***.

13.     Specifically, the Green Dot Agency Agreement provided:

Alliance Partner[17] agrees that it will hold **Cardholder Funds in trust on behalf of the cardholders**, and that Cardholder Funds will not be made subject to, **and Alliance Partner will not voluntarily make all or any portion of the Cardholder Funds available to, creditors (whether secured or unsecured) of Alliance Partner or its affiliates, whether in connection with any bankruptcy or secured creditor proceedings filed by or against Alliance Partner**, its affiliates or otherwise and will not otherwise take any action inconsistent with [Green Dot's ultimate] ownership of the Cardholder Funds. **Alliance Partner shall take such steps as are necessary to: (a) exclude Cardholder Funds from the scope of any pledge, assignment, transfer or security interest made or granted, voluntarily or involuntarily, by Alliance Partner to any third party; and (b) remove such Cardholder Funds from inclusion in the assets of Alliance Partner in connection with any bankruptcy proceeding or proceeding taken by any creditor of Alliance Partner.** [* * *] Alliance Partner shall not argue or assert in any bankruptcy proceeding that the Cardholder Funds are part of its bankruptcy estate.[18]

14.     Similarly, the Authorized Delegate Agreement provided:

**Agent[19] will hold the [Cardholder Funds], minus the Agent Commission [* * *] in trust solely for the benefit of Blackhawk CA**, and no part of the [Cardholder Funds] will be deemed the property of, or an asset of, Agent. **Until remitted to**

---

[16] *See* the Motion for Summary Judgment, Ex. B, Juniper Dec., ¶ 6.

[17] The term "Alliance Partner" referred to the Debtor.

[18] *See* the Adversary Complaint, Exhibit 1, p. 2. (emphasis added).

[19] The term "Agent" referred to the Debtor.

**Blackhawk CA, the aggregate of any and all [Cardholder Funds] that are commingled with other property of Agent will be impressed with a trust in favor of Blackhawk CA.** Agent (i) will not use all or any portion of the [Cardholder Funds] for its corporate purposes, including by granting any interest or right to the [Cardholder Funds] to any third party; (ii) will not voluntarily make all or any portion of the [Cardholder Funds] available to its creditors in the event of bankruptcy; and (iii) will not otherwise take any action inconsistent with Blackhawk CA's ownership of the [Cardholder Funds].[20]

15.     In addition to having this express trust language in these two agreements, both the Green Dot Agency Agreement and the Authorized Delegate Agreement referenced and incorporated, as applicable, specific state statutes governing the sale of financial instruments (what Blackhawk refers to as the "State Money Transmitter Laws"), and expressly name the Debtor as Blackhawk's authorized delegate for purposes of applying those laws.[21]

16.     Blackhawk—although it relies heavily on these so-called State Money Transmitter Laws and the fact that they are referenced in the Green Dot Agency Agreement and Authorized Delegate Agreement—has not spent much time specifically presenting them or quoting them to this court.  The facts are that the Debtor was doing business, at the time of the bankruptcy filing, in *23 states*.[22]  Blackhawk attached a "Compendium of State Money Transmitter Laws" at Exhibit 4 to its Adversary Complaint, which is a listing of *13 state statutes*.[23]  The Green Dot Agency Agreement and Authorized Delegate Agreement themselves

---

[20] *See* the Adversary Complaint, Exhibit 2, p. 1.  (emphasis added).

[21] *See* the Adversary Complaint, Exhibit 1 at Appendices 1-3; *see also* the Adversary Complaint, Exhibit 2 at pp. 6-13.

[22] The 23 states in which the Debtor operated were:  Arizona, Arkansas, Colorado, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Minnesota, Missouri, Montana, Nebraska, New Mexico, North Dakota, Ohio, Oklahoma, South Dakota, Texas, Utah, Wisconsin, and Wyoming.  *See* First Day Declaration of Stanley B. Latacha in Support of Chapter 11 Petitions and First Day Motions, ¶ 8 [DE #3].

[23] The 13 states with money transmitter statutes to which Blackhawk alerted the court were: Arizona, Arkansas, Florida, Idaho, Illinois, Indiana, Iowa, Minnesota, Nebraska, North Dakota, Ohio, Oklahoma, South Dakota, and Texas.  *See* the Adversary Complaint, Exhibit 4.

also make somewhat of a haphazard reference and compilation of these laws. Specifically, the Green Dot Agency Agreement attaches an Appendix 1, listing out **29 states** that have some version of money transmitter statutes or common law (however, **17 of these 29 state**s are in states in which the Debtor did not operate Retail Stores).[24] In any event, the agreement states that these laws shall apply "to any Client locations in the states listed."[25] The Authorized Delegate Agreement attaches an Exhibit B, listing out **eight states** that have some version of money transmitter statutes (however, two[26] of these eight states are states in which the Debtor did not operate Retail Stores). In spite of all this, the Debtor does not dispute that any or all states in which the Debtor did business may have state monetary transmitter laws that were applicable to the Debtor's sale of SVCs. Blackhawk describes these statutes as applying to both debit and gift cards (among other financial instruments) and generally requiring a party such as the Debtor to hold the proceeds of sales of such financial instruments in trust from the moment of receipt until remitting them to the principal, and in the event of commingling the proceeds with other property, "generally results in the imposition of a trust on all of the authorized delegate's property in an amount equal to the total value of the sale proceeds subject to remittance."[27]

---

[24] The 17 states listed in which the Debtor did not even operate Retail Stores were: Alaska, Connecticut, District of Columbia (not technically a state), Hawaii, Kentucky, Maine, Maryland, Michigan, New Hampshire, New Jersey, North Carolina, Oregon, Tennessee, Vermont, Virginia, Washington, and West Virginia. *See* the Adversary Complaint, Exhibit 1 at Appendix 1.

[25] *See* the Adversary Complaint, Exhibit 1 at Appendix 1. *See also* Appendices 2 & 3 thereto.

[26] North Carolina and Washington statutes were listed as applying if the Debtor did business there and the Debtor did not. *See* the Adversary Complaint, Exhibit 2 (and the Exhibit B thereto).

[27] *See* the Adversary Complaint, ¶ 14.

17.     The U.S. Alliance Partner Agreement, which, again, applied to the Closed Loop SVCs (*i.e.,* the retail-branded gift cards), had no trust language *per se*, and only provided that any claim, controversy, or dispute relating to a Closed Loop transaction would be governed by California law, but did not specifically incorporate the State Money Transmitter Laws.[28] Blackhawk nevertheless argues that all of the same trust concepts apply to the Closed Loop SVC gift cards, because California has a statute that pertains to gift cards that specifically provides that a "gift card constitutes value held in trust by the issuer of the gift certificate on behalf of the beneficiary of the gift certificate" and other states have similar laws specifically pertaining to gift cards.[29]  The court notes that the Debtor had no Retail Stores in California.

18.     The Retail Stores sold and activated SVCs through and after the Petition Date and stopped the sale of SVCs before the Debtor's postpetition going-out-of-business sales, described below.[30]  The Debtor remitted all SVC sale proceeds, less the applicable service fee, to Blackhawk on all postpetition sales.[31]  Thus, all of the amounts currently claimed by Blackhawk to be subject to a trust relate to 19 days' worth of prepetition sales, that were invoiced between September 23, 2014 and the Petition Date.[32]  **Blackhawk's records indicate that between September 23, 2014 and the Petition Date, the sale of SVCs generated $820,538.18 in**

---

[28] *See* the Adversary Complaint, Exhibit 3 at p. 16.

[29] *See* Cal. Civ. Code Ann. § 1749.6(b) (West 2015).  Blackhawk does not specifically cite to other states' statutes that might specifically pertain to gift cards, *per se*.  It also does not address the significance to Blackhawk of the fact that the trust, under the California statute, is imposed on the ***card issuer*** in favor of the ***card holder*** as beneficiary.

[30] *See* the Motion for Summary Judgment, Ex. B, Juniper Dec., ¶ 7.

[31] *Id.*

[32] *Id.*

**Cardholder Funds.**[33] As explained further below, the majority of those funds were paid to secured lender Wells Fargo, prior to the Petition Date, in satisfaction of the Debtors' credit agreement with Wells Fargo.[34]

### b. The Wells Fargo Indebtedness

19. As of the Petition Date, the Debtors were borrowers under an Amended and Restated Credit Agreement, dated as of May 30, 2014, as amended pursuant to that certain First Amendment to and Waiver to Credit Agreement, dated as of September 4, 2014 (as amended, the "WF Credit Agreement"), with Wells Fargo Bank, N.A. ("Wells Fargo"), as administrative agent, collateral agent, and lender.[35] CIT Bank ("CIT") is also a lender under the WF Credit Agreement.[36] The outstanding amount under the WF Credit Agreement as of the Petition Date was approximately $104.2 million.[37]

20. Pursuant to the WF Credit Agreement, Wells Fargo and CIT, as revolving lenders, agreed to make certain revolving loans from time to time to the Debtors in an aggregate amount not to exceed at any time outstanding $125 million, subject to availability under a borrowing base (the "Revolving Loan").[38]

---

[33] *See* the Adversary Complaint, ¶ 20. Note, the Debtor has not presented any contradictory summary judgment evidence in its Motion for Summary Judgment disputing this amount. However, the court would note that the Debtor listed Blackhawk Network, Inc. as an unsecured creditor in Schedule F in the amount of $307,762.50. *See* DE # 333 in the Bankruptcy Case.

[34] *See* the Motion for Summary Judgment, Ex. B, Juniper Dec., ¶ 7.

[35] *Id.* at ¶ 8.

[36] *Id.*

[37] *Id.*

[38] *Id.* at ¶ 10.

21.     In connection with the Debtors' bankruptcy filing, the Debtors ultimately entered into an agreement to obtain secured, super-priority, postpetition loans, advances and other financial accommodations (the "DIP Facility") with (a) Wells Fargo, as administrative agent and collateral agent for its own benefit and the benefit of the other Credit Parties, (b) Wells Fargo, as term loan agent, and (c) the lenders from time to time party thereto.[39]   The terms of this agreement were memorialized in that certain Debtor in Possession Credit Agreement dated as of October 12, 2014 (the "DIP Credit Agreement").[40]

22.     Under the terms of the DIP Credit Agreement, the Debtors were required to satisfy certain of their prepetition obligations under the WF Credit Agreement through application of the proceeds of the collateral set forth in the DIP Credit Agreement, derived primarily from the proceeds from sale of the Debtors' inventory, before payment of the Debtors' postpetition obligations under the DIP Credit Agreement.[41]

23.     On November 14, 2014, the court entered the Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 (i) Approving Postpetition Financing, (ii) Authorizing Use of Cash Collateral, (iii) Granting Liens and Providing Superpriority Administrative Expense Status, (iv) Modifying Automatic Stay, and (v) Granting Related Relief and the Debtors paid the Revolving Credit Facility in full.[42]

24.     On January 28, 2015, the Debtors paid the DIP Facility in full.[43]

---

[39] *Id.* at ¶ 11.

[40] *Id.*

[41] *Id.* at ¶ 13.

[42] *Id.* at ¶ 14; *see also* DE # 326 in the Bankruptcy Case.

[43] *See* the Motion for Summary Judgment, Ex. B, Juniper Dec., ¶ 15.

### c. The Debtor's Cash Management System and Usage of the SVC Sale Proceeds

25.     As of the Petition Date, the Debtors utilized a total of approximately 204 bank accounts (the "Bank Accounts") with approximately 137 different financial institutions that operated in connection with a centralized cash management system (the "Cash Management System").[44]  Through the Bank Accounts, the Debtors collected, transferred and disbursed funds generated from their operations on a daily basis.[45]  The Debtors routinely deposited, withdrew, and otherwise transferred funds to, from and between the Bank Accounts by various methods including check, wire transfer, automated clearing house transfer, and electronic funds transfer.[46]

26.     As part of the Bank Accounts, each of the Debtors' Retail Store locations maintained an individual deposit account (collectively, the "Store Deposit Accounts") into which each individual store's receipts and collections were deposited daily.[47]  The Store Deposit Accounts were swept regularly, on Mondays, Wednesdays and Fridays, into a master depository account (the "Master Depository Account") maintained at Wells Fargo.[48]

27.     In the ordinary course of business, funds received via personal check or cash for payment of SVCs were deposited into the respective Store Deposit Account.[49]  Payments by credit or debit card were sent directly to the Master Depository Account.[50]

---

[44] *Id.* at ¶ 16.

[45] *Id.*

[46] *Id.*

[47] *Id.* at ¶ 17.

[48] *Id.*

[49] *Id.* at ¶ 18.

[50] *Id.*

28.     In addition to amounts from the Store Deposit Accounts, certain other funds and deposits, such as credit card settlements, customer charge account payments, desktop deposits, and checks delivered directly to the Debtors' headquarters were deposited directly into the Master Depository Account.[51]

29.     Funds in the Master Depository Account were swept on a daily basis by Wells Fargo, in its capacity as administrative agent and lender under the Debtors' prepetition Revolving Credit Facility and were applied by Wells Fargo to the Debtors' payment obligations under the Revolving Credit Facility.[52]  Wells Fargo typically made such sweeps around noon.[53]

30.     Wells Fargo swept the Master Depository Account on Friday, October 10, 2014.[54] Upon the filing of the chapter 11 case on Sunday, October 12, 2014, the bank accounts held at Wells Fargo were frozen and Wells Fargo did not sweep the Master Depository Account until the court's approval of the Cash Management System on October 16, 2014.[55]  As of the Petition Date, the Debtors had $2,556,448.51 in their Disbursement Account, Operating Account (defined below) and the Master Depository Account, $2,341,296.05 of which had been drawn down from the Revolving Credit Facility to the Operating Account primarily to pay required sales tax, and also to pay other planned disbursements and to cover checks outstanding.[56]

---

[51] *Id.* at ¶ 19.

[52] *Id.* at ¶ 20.

[53] *Id.*

[54] *Id.* at ¶ 21.

[55] *Id.*

[56] *Id.*

31.     Prior to September 2014, the Debtors would occasionally request of Wells Fargo to leave certain amounts in its Bank Accounts and not apply them to the Debtors' payment obligations.[57] Wells Fargo would comply and apply all funds less the requested amount towards repayment of the Revolving Credit Facility.[58]  In early September 2014, Wells Fargo stopped this practice and, with each sweep, applied all amounts in the Master Depository Account (which included Cardholder Funds that had been commingled with the Debtor's other assets) towards the Debtors' payment obligations under the Revolving Credit Facility.[59]  It is undisputed that Blackhawk did not have any knowledge of the terms of the Debtors' credit facility with Wells Fargo, nor that Wells Fargo was sweeping the Cardholder Funds from the Master Depository Account.[60]

32.     On a regular basis, the Debtors requested draws under the Revolving Credit Facility, with the availability of funds dependent upon the Debtors' borrowing base under the applicable loan documents.[61]  Funds drawn by the Debtors under the Revolving Credit Facility were deposited into an operating account (the "Operating Account") and a payroll account (the "Payroll Account") maintained by the Debtors at Wells Fargo.[62]  All electronic payments made by the Debtors, including automatic clearing house payments, automatic draws, and wire transfers were made from the Operating Account.  Payments to Blackhawk were made from the

---

[57] *Id.* at ¶ 22.

[58] *Id.*

[59] *Id.*

[60] *See* the Response, Albert Acevedo Dec. ¶¶ 4-5.

[61] *See* the Motion for Summary Judgment, Ex. B, Juniper Dec., ¶ 23.

[62] *Id.*

Operating Account.[63] The Payroll Account was used for check disbursements to satisfy obligations relating to payroll to the Debtors' employees.[64]

33. In addition, the Debtors maintained a disbursement account at Wells Fargo (the "Disbursement Account") which was used for check disbursements to satisfy obligations relating to accounts payable.[65] The Disbursement Account is a zero-balance account, and a sufficient amount of funds necessary to make such payments was regularly transferred from the Operating Account to the Disbursement Account.[66]

34. On the Petition Date, the Debtors filed a motion requesting leave of the court and the entry of an order authorizing the Debtors to continue to use the Cash Management System.[67]

35. On October 16, 2014, the court entered the Order Authorizing (i) Continued Use of Existing Cash Management System, (ii) Maintenance of Existing Bank Accounts, (iii) Continued Use of Existing Business Forms, and (iv) Maintenance of Existing Investment Practices (the "Cash Management Order"), authorizing the Debtors "to continue to maintain, operate and make transfers under the Cash Management System in the ordinary course of business in the same manner and on the same basis as the Debtors implemented and maintained the same prior to the commencement of these chapter 11 cases."[68]

---

[63] *Id.*

[64] *Id.*

[65] *Id.* at ¶ 24.

[66] *Id.*

[67] *Id.* at ¶ 27.

[68] *Id.* at ¶ 28; *see also* DE # 70 in the Bankruptcy Case.

36.     Through this Cash Management System, all funds received from the prepetition sales of SVCs not previously swept on or prior to October 10, 2014 would have been swept into the Master Depository Account and applied to the Debtors' payment obligations under the Revolving Credit Facility on October 16, 2014.[69]  Combined SVC sales from October 10, 2014, amounted to $44,837.84, which, less the Debtor's commission, resulted in $42,734.88 owed to Blackhawk under the Agency Agreements.[70]  Combined SVC sales from October 11, 2014, amounted to $37,301.03, which, less the Debtor's commission, resulted in $35,486.50 owed to Blackhawk under the Agency Agreements.[71]  Combined SVC sales from October 12, 2014, amounted to $21,085.45, which, less the Debtor's commission, resulted in $19,920.99.[72]  Thus, at a maximum, $98,142.37 of funds owed to Blackhawk resided in Master Depository Account on the Petition Date.[73]  As explained above, all such funds were swept into the Master Depository Account and applied to the Debtors' payment obligations under the Revolving Credit Facility on October 16, 2014.[74]

### d.   Debtors' Postpetition Sale of Assets

37.     Upon commencement of the above-captioned chapter 11 case, the Debtors pursued a marketing process for the Debtors' assets on a dual track: (1) marketing the liquidation of the Retail Stores (*i.e.,* marketing the right to conduct going-out-of-business sales) and seeking

---

[69] *See* the Motion for Summary Judgment, Ex. B, Juniper Dec., ¶ 29.

[70] *Id.*

[71] *Id.*

[72] *Id.*

[73] *Id.*

[74] *Id.*

the highest liquidation price, and (2) marketing a going concern transaction pursuant to section 363 of the Bankruptcy Code.[75] Ultimately, the Debtors determined that the highest value for creditors would be gained through a liquidation of the Debtors' Retail Stores and its businesses, as well as through various strategic real estate asset sales.[76]

38.     On November 20, 2014, the court entered the Order Pursuant to Sections 105(a), 363, 365, and 554 of the Bankruptcy Code (i) Approving the Debtors' Entry into Agency Agreement, (ii) Authorizing the Debtor to Sell Certain Merchandise Through Going Out of Business Sales, (iii) Authorizing the Debtors and the Agent to Abandon Unsold Property, (iv) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances and Interests, and (v) Granting Related Relief authorizing the sale of inventory and merchandise in going out of business sales conducted through the Debtors' agent, Tiger Capital Group, LLC, SB Capital Group, LLC and Great American Group WF, LLC.[77] On December 17, 2014, the court entered the Order Authorizing and Approving the Sale of the Debtors' Distribution Center in Abilene, Kansas and Certain Related Personal Property Assets, Free and Clear of any and all Liens, Claims, Encumbrances and Other Interests authorizing the sale of certain of the Debtors' assets.[78] The court also entered orders approving the sale of certain of the Debtors' real estate on December 23, 2014.[79]

---

[75] *Id.* at 30.

[76] *Id.*

[77] *Id.* at 31; *see also* DE # 369 in the Bankruptcy Case.

[78] *See* the Motion for Summary Judgment, Ex. B, Juniper Dec., ¶ 32; *see also* DE # 530 in the Bankruptcy Case.

[79] *See* the Motion for Summary Judgment, Ex. B, Juniper Dec., ¶ 33; *see also* DE ## 555 & 557 in the Bankruptcy Case.

39.     Currently, the Debtors hold a total of $16,510,747.52 in the Disbursement Account, the Operating Account and the Payroll Account, which were derived from the sale of Debtors' inventory, real estate, and other assets approved by this court on November 20, December 17, and December 23, 2014.[80]

### e. The Adversary Proceeding

40.     On January 22, 2015, Blackhawk filed the Adversary Proceeding asserting four counts for relief: (1) a declaration, under the terms of the Agency Agreements, that Cardholder Funds in the amount of $820,538.18 were not property of the Debtor's estate; (2) a declaration that the Cardholder Funds constituted trust funds, and, because of this, Blackhawk now has a lien, enforceable against all of the Debtor's property, in an amount equal to $820,538.18; (3) a declaration that all unremitted Cardholder Funds derived from the sale and activation of Closed Loop gift card SVCs are trust funds held by the Debtors for the benefit of Blackhawk;[81] and (4) an order, to the extent the court grants any relief under any of the above counts, directing the Debtor to tender cash or other property of an equivalent value to Blackhawk in full satisfaction of Blackhawk's lien for the value of Cardholder Funds which the Debtor was to hold in trust for Blackhawk.

## IV.     SUMMARY JUDGMENT STANDARD

41.     Summary judgment is appropriate whenever a movant establishes that the pleadings, affidavits, and other evidence available to the court demonstrate that no genuine issue

---

[80] *See* the Motion for Summary Judgment, Ex. B, Juniper Dec., ¶ 34.

[81] Recall that the U.S. Alliance Agreement dealing with Closed Loop gift cards was not as clear as the other two agreements with regard to trust fund concepts and did not specifically reference the State Money Transmitter Laws as applying.  The court assumes that this is why there was a separate count on the subject of the Closed Loop SVC gift cards.

of material fact exists, and the movant is, thus, entitled to judgment as a matter of law.[82] A genuine issue of material fact is present when the evidence is such that a reasonable fact finder could return a verdict for the non-movant.[83] Material issues are those that could affect the outcome of the action.[84] The court must view all evidence in a light most favorable to the non-moving party, Blackhawk.[85] Factual controversies must be resolved in favor of the non-movant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts."[86] If the movant satisfies its burden, the non-movant must then come forward with specific evidence to show that there is a genuine issue of fact.[87] The non-movant may not merely rely on conclusory allegations or the pleadings.[88] Rather, it must demonstrate specific facts identifying a genuine issue to be tried in order to avoid summary judgment.[89] Thus, summary judgment is proper if the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case."[90]

---

[82] FED. R. CIV. P. 56(a); *Piazza's Seafood World, LLC v. Odom*, 448 F.3d 744, 752 (5th Cir. 2006); *Lockett v. Wal-Mart Stores, Inc.*, 337 F. Supp. 2d 887, 891 (E.D. Tex. 2004).

[83] *Piazza's Seafood World, LLC*, 448 F.3d at 752 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[84] *Wyatt v. Hunt Plywood Co., Inc.*, 297 F.3d 405, 409 (5th Cir. 2002), *cert. denied*, 537 U.S. 1188 (2003).

[85] *Piazza's Seafood World, LLC*, 448 F.3d at 752; *Lockett*, 337 F. Supp. 2d at 891.

[86] *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

[87] *Lockett*, 337 F. Supp. 2d at 891; *see also Ashe v. Corley*, 992 F.2d 540, 543 (5th Cir. 1993).

[88] *Lockett*, 337 F. Supp. 2d at 891.

[89] FED. R. CIV. P. 56(c)(1); *Piazza's Seafood World, LLC*, 448 F.3d at 752; *Lockett*, 337 F. Supp. 2d at 891.

[90] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## V.      LEGAL ANALYSIS

42.      As stated above, Blackhawk's Adversary Complaint asserts four separate causes of action against the Debtor.  Counts 1-3 of the Adversary Complaint collectively ask this court to declare that the Cardholder Funds (*i.e.*, the SVC sale proceeds) were trust funds under the terms of the Agency Agreements and the State Money Transmitter Laws (or, in the case of gift cards, perhaps under California gift card laws and similar laws of other jurisdictions); that such trust funds did not belong to the Debtor's estate; and that Blackhawk is entitled to a lien in the amount of $820,538.18 against *all* of the Debtor's assets—specifically, the Debtor's now-existing cash that did not specifically derive from the SVC sales.  Moreover, to the extent the court grants Blackhawk any form of monetary relief in Counts 1-3 of the Adversary Complaint, Count 4 requests that the court order the Debtor to turnover such funds to Blackhawk.  The Debtor has moved for summary judgment against Blackhawk, seeking to dismiss all four counts of Blackhawk's Adversary Complaint on the grounds that: (1) there is no legal basis for this court to impose or expand a floating trust, based upon Blackhawk's prepetition claim, upon cash which is now being held by the Debtor, which was generated postpetition from sales of assets wholly unrelated to the SVCs and was never commingled with SVC sale proceeds; and (2) even if such a floating trust argument as to general assets is viable, Blackhawk cannot satisfy its legal burden to trace its original trust funds to the Debtor's current assets.

### a.  Defining the So-Called State Money Transmitter Laws

43.      First, the court believes it is necessary to give more definition to the so-called "State Money Transmitter Laws" than Blackhawk has endeavored to do in its papers and presentation.

44.     As mentioned earlier, Blackhawk simply attached a "Compendium of State Money Transmitter Laws" at Exhibit 4 to its Adversary Complaint, which was a listing of and selective quoting from *13 state statutes*.  As also earlier mentioned, the Debtor actually conducted business in *23 states*.  Blackhawk never addressed the omission from its Compendium of the laws that may or may not exist in *10 of the states* in which the Debtor conducted business.

45.     Additionally, the Green Dot Agency Agreement and Authorized Delegate Agreement themselves made a haphazard compilation of these laws.  Specifically, the Green Dot Agency Agreement attached an Appendix 1, listing out *29 states* that have some version of money transmitter statutes or relevant common law (however, *17 of these 29 states* are states in which the Debtor did not operate Retail Stores).[91]  The Authorized Delegate Agreement attached an Exhibit B, listing out *eight states* that have some version of money transmitter statutes (however, two[92] of these eight states are states in which the Debtor operated no Retail Stores).

46.     Additionally, Blackhawk more generally asserts that there are State Money Transmitter Laws *or gift card laws* that:  (a) are applicable to all of the Debtor's sales of the SVCs, (b) generally require a party such as the Debtor to hold the proceeds of sales of such SVCs in trust from the moment of receipt until remitting them to the principal (*i.e.,* Blackhawk), and, perhaps most importantly, (c) in the event of commingling of the proceeds with other property, generally result "in the imposition of a trust on *all* of the authorized delegate's property in an amount equal to the total value of the sale proceeds subject to remittance" and dispense with the need for any tracing.[93]

---

[91] The agreement states that these laws shall apply "to any Client locations in the states listed."  *See* the Adversary Complaint, Exhibit 1 at Appendix 1.  *See also* Appendices 2 & 3 thereto.

[92] *See* the Adversary Complaint, Exhibit 2 (and the Exhibit B thereto).

[93] *See* the Adversary Complaint, ¶ 14 (emphasis added).

47. This court has been reluctant to parse through the dozens of very lengthy statutes referenced by Blackhawk to find the exact language upon which it relies for every single state in which the Debtor sold SVCs—particularly when most of the statutes have only been partially cited by Blackhawk and are not fully reproduced in its Compendium, also since some of the statutes are from states in which the Debtor did not even conduct business, and also since some laws were alleged to exist in some states but were not cited (*i.e.,* statutes for at least 10 states in which the Debtor did business were not cited or provided).

48. In any event, the Debtor seems not to dispute that there are so-called State Money Transmitter Laws that would apply to all of the SVCs that the Debtor sold and that they, at a minimum, impose a trust on SVC sale proceeds.[94] But for the sake of clarity, the court will define "State Money Transmitter Laws" as follows: any and all statutes or other legal authority cited by Blackhawk in its Adversary Complaint and attachments thereto that Blackhawk referred to as the "State Money Transmitter Laws" and that exist in any of the 23 states in which the Debtor conducted business. And, since it was undisputed, the court will assume that these State Money Transmitter Laws applied to ***all SVCs sold*** by the Debtor—even though some of the SVCs were in the nature of debit cards and some were in the nature of Participating Vendor ***gift*** cards (the court has nagging questions as to whether the latter would actually be governed by the State Money Transmitter Laws, but the court will assume, as the parties have done, that they do).[95]

---

[94] The Debtor also does not raise any concerns about the standing of Blackhawk to assert causes of action under the State Money Transmitter Laws. Thus, the court will assume Blackhawk has standing and will not research on its own whether it is Blackhawk or state attorneys general or other state officials with standing to raise the issues presented herein.

[95] The court asked Blackhawk to address this at oral argument but did not get a definitive answer.

49. In further defining the State Money Transmitter Laws, the court will also give some representative examples of language that the court views as pertinent.

(1) **_Texas._** In Texas, where 32 of the Debtor's Retail Stores were located, the relevant statute seems to be Texas Finance Code § 151.404(b), which states that "A license holder's authorized delegate shall hold in trust all money received for transmission by or for the license holder from the time of receipt until the time the money is transmitted by the authorized delegate to the license holder. A trust resulting from the authorized delegate's actions is in favor of the license holder." Subsection (c) of the same statute places restrictions on commingling of such funds. Subsection (d) states that, "If a license holder or the license holder's authorized delegate commingles any money received for transmission with money or other property owned or controlled by the license holder or delegate, all commingled money and other property are impressed with a trust as provided by this section in an amount equal to the amount of money received for transmission, less the amount of fees paid for the transmission."

(2) **_Arizona._** Similarly, in Arizona, where seven of the Debtor's Retail Stores were located, Arizona Statute § 6-1209(b) provides that "An authorized delegate of a licensee holds in trust for the benefit of a licensee all monies received from the sale or delivery of the licensee's payment instruments or monies received for transmission. If an authorized delegate commingles any such monies with any monies or other property owned or controlled

by the authorized delegate, a trust against all commingled proceeds and other monies or property owned or controlled by the delegate is imposed in favor of the licensee in an amount equal to the amount of the proceeds due the licensee."

(3)    ***Nebraska.***    Similarly, in Nebraska, where 13 of the Debtor's Retail Stores were located, § 8-2740(6) of the Nebraska Money Transmitters Act provides that "All funds, less fees, received by an authorized delegate of a licensee from the sale or delivery of a payment instrument issued by a licensee or received by an authorized delegate for transmission shall, from the time such funds are received by such authorized delegate until such time when the funds or an equivalent amount are remitted by the authorized delegate to the licensee, constitute trust funds owned by and belonging to the licensee.  If an authorized delegate commingles any such funds with any other funds or property owned or controlled by the authorized delegate, all commingled proceeds and other property is impressed with a trust in favor of the licensee in an amount equal to the amount of the proceeds due the licensee."

(4)    ***North Dakota.***    Similarly, in North Dakota, where another 13 of the Debtor's Retail Stores were located, § 13-09-16(6) of the North Dakota Century Code, dealing with Money Transmitters, reads almost identical to the Nebraska statute quoted above, providing that "All funds, less fees, received by an authorized delegate of a licensee from the sale or delivery of a payment instrument issued by a licensee or received by an authorized

delegate for transmission must, from the time such funds are received by

such authorized delegate until such time when the funds or an equivalent

amount are remitted by the authorized delegate to the licensee, constitute

trust funds owned by and belonging to the licensee. If an authorized

delegate commingles any such funds with any other funds or property

owned or controlled by the authorized delegate, all commingled proceeds

and other property is impressed with a trust in favor of the licensee in an

amount equal to the amount of the proceeds due the licensee."

### b. What the State Money Transmitter Laws Do and Do Not Do.

50.     So, now, with the chore accomplished of defining State Money Transmitter Laws

with a little more specificity, the court must confront a couple of interpretation questions to

ascertain whether Blackhawk's Adversary Complaint survives summary judgment. The first

question is whether the language of these State Money Transmitter Laws does, indeed, impose an

***express trust*** in favor of Blackhawk on sale proceeds attributable to the SVCs? The easy answer

to that question is yes. The Debtor does not dispute this and, indeed—assuming these statutes

apply to all SVCs—the language of the statutes is clear that all funds, less fees, received by a

seller of the SVCs, from the time such funds are received, until such time when the funds or an

equivalent amount are remitted, constitute trust funds owned by and belonging to the party in

Blackhawk's shoes.

51.     Second, does the language of these State Money Transmitter Laws also create a

***floating trust or lien*** whenever SVC sale proceeds are commingled with other assets of the

Retail Store–and, if so, does that floating lien apply only to ***the commingled batch*** of assets or to

***all property*** of the Debtor? While the words "floating trust" or "floating lien" are not used *per se*

in the State Money Transmitter Laws, such terminology has occasionally been adopted in case law.  A floating trust has been stated to exist where trust funds have been commingled (*i.e.*, not properly segregated) and, as such, is characterized as floating, rather than attaching to a specific trust *res*.[96]  This court interprets the State Money Transmitter Laws to, indeed, create a floating trust or lien concept whenever SVC sale proceeds are commingled, but **only as to assets in the commingled batch** (*i.e.,* the trust or lien would have attached only to the SVC funds and the other funds in the commingled account into which the SVC funds were deposited)–not on all of the general assets of the Debtor.

52.    Looking at the statute in the state of Texas, it reads specifically as follows:  "If a license holder or the license holder's authorized delegate [*i.e.,* here the Debtor] **commingles any money received for transmission** with **money or other property owned** or controlled by the license holder or delegate, **all commingled money and other property** are impressed with a trust as provided by this section in an amount equal to the amount of money received for transmission, less the amount of fees paid for the transmission."[97]  This language appears to be only addressing a commingled batch of property.  The trust or lien appears to attach to:  (a) the "money for transmission" (*i.e.,* the SVC sale proceeds), and (b) the "money or other property owned" by the Debtor with which it was commingled.  The language of the statutes in other states reads substantially the same.  For example, in Arizona, the relevant statute reads:  "If an authorized delegate [again, the Debtor] **commingles** any **such monies** [*i.e.,* the SVC sale proceeds] with **any monies or other property owned** or controlled by the authorized delegate, a trust against **all**

_____

[96] *See In re Fresh Approach, Inc.*, 48 B.R. 926, 931 (Bankr. N.D. Tex. 1985) (describing the nature of a "floating trust" under PACA).

[97] Tex. Fin. Code Ann. § 151.404(d) (West 2015) (emphasis added).

***commingled proceeds and other monies or property owned*** or controlled by the delegate is imposed in favor of the licensee in an amount equal to the amount of the proceeds due the licensee."[98]  To be clear, when these statutes use the words "other monies or property," the context seems clear that the reference is to the "other monies or property" in the commingled batch.[99]

53.      As mentioned earlier, it is undisputed that ***the commingled batch of assets no longer even existed*** at the time this Adversary Proceeding was commenced.  The SVC sale proceeds had been deposited into a bank account that was swept down to a $0 balance almost three months before this Adversary Proceeding was filed.   But Blackhawk has sought to have its floating trust reach ***not just a commingled batch of assets***, but ***the general assets*** of the Debtor—in fact, Blackhawk wants its trust to attach to any and all going-out-of-business sale proceeds that were generated postpetition.

54.      This court concludes that Blackhawk may not look to the State Money Transmitter Laws to impose a floating trust on the general, postpetition assets of the Debtor, specifically where the undisputed facts demonstrate that the Debtor commingled the SVC sale proceeds in its Master Depository Account prepetition, that such funds were swept by Wells Fargo and completely depleted, and that the funds currently held by the Debtor are completely derived from the postpetition sales of the Debtor's property and do not include any funds related to the sale of SVCs.  This court does not interpret the State Money Transmitter Laws so broadly as to create a floating trust or lien on ***general assets*** of a seller of SVCs.  But even if Blackhawk

---

[98] Az. Rev. Stat. Ann. § 6-1209(b) (West 2015) (emphasis added).

[99] *See also* Neb. Rev. Stat. Ann. § 8-2740(6) (West 2015) (using similar language); N.D.C.C. Ann. § 13-09-16(6) (West 2015) (North Dakota Century Code dealing with Money Transmitters using similar language).

is correct about the wording or intent of the State Money Transmitter Laws being this broad, the statutes cannot be applied in a way to dispense with the need for tracing in the context of a federal bankruptcy case.  Thus, the State Money Transmitter Laws would be unenforceable in bankruptcy, to the extent they purported to:  (a) create a trust/lien on all general assets of the Debtor; and (b) dispense with the need for tracing.

> **c.  Assuming the State Money Transmitter Laws Operate to Create a Floating Trust or Lien on All General Assets of a Seller of SVCs, in the Event of Commingling and Non Remittance of the SVC Sale Proceeds, Are the Statutes Enforceable in Bankruptcy if They Dispense With the Need for Tracing?**

55.    Again, Blackhawk argues that the State Money Transmitter Laws—by creating this floating trust concept—not only expand the corpus/*res* from the original SVC sale proceeds to all assets of the Debtor, but also dispense with the ***need for any tracing.***  The distributor analogizes the money transmitter statutes to the Perishable Agricultural Commodities Act ("PACA")[100] and the Packers and Stockyards Act ("PASA")[101] statutes, which have a concept of granting a floating lien or trust on derivative and commingled assets, and have been widely interpreted by courts as dispensing with the need for tracing. Thus, the legal question now confronted is whether these State Money Transmitter Laws should be interpreted as truly dispensing with the need for tracing. The court holds no.

56.    First, on the topic of PACA and PASA, what do these statutes truly provide and are they genuinely analogous?  First, it is noteworthy that the PACA and PASA statutes themselves state nothing about whether tracing is or is not required.  However, courts interpreting PACA and PASA have reached the conclusion that tracing is not required when trust

---

[100] *See* 7 U.S.C. § 499e(c) (2015).

[101] *See* 7 U.S.C. § 197(b) (2015).

assets and their derivative products and receivables have been commingled with other assets because of some of the policy-expressions in the statutes, the legislative history underlying the statutes, and—perhaps most important—practicalities and reality.

57.    Starting with PACA, the policy goals underlying it are clearly stated in the statute itself.  "It is hereby found that a burden on commerce is caused by financing arrangements under which . . . merchants . . . who have not made payments for perishable agricultural commodities purchased . . . give lenders a security interest in, such commodities, or on inventories of food or other products derived from such commodities, and any receivables or proceeds from the sale of such commodities or products, and that such arrangements are contrary to the public interest. This subsection is intended to remedy such burden on commerce in perishable agricultural commodities and to protect the public interest."  The statute goes on to provide that "Perishable agricultural commodities received by a commission merchant . . . and all inventories of food or other products derived from agricultural commodities, and any receivables or proceeds from the sale of such commodities or products, shall be held by such commission merchant . . . in trust for the benefit of all unpaid suppliers, sellers, or agents."[102]

58.    The PASA statute has similar language:  "It is hereby found that a burden on and obstruction of commerce in poultry  is caused by financing arrangements under which live poultry dealers encumber, give lenders security interest in, or place liens on, poultry obtained by such persons by purchase in cash sales or by poultry growing arrangements, or on inventories of or receivables or proceeds from such poultry or poultry products therefrom, when payment is not made for the poultry and that such financing arrangements are contrary to the public interest. This section is intended to remedy such burden on and obstruction of commerce in poultry and

---

[102] *See* 7 U.S.C. § 499e(c)(1) & (2) (2015).

protect the public interest."[103]  The statute goes on to provide for a trust on poultry, poultry products derived therefrom, inventories, receivables and proceeds held by a dealer for the benefit of all unpaid cash sellers or poultry growers.  There are the same type of provisions for other livestock besides poultry.

59.    The Fifth Circuit was confronted with interpreting the PASA statute in the context of a bankruptcy case several years back in a case called *In re Gotham*.[104]  In *Gotham*, the Fifth Circuit noted that Congress was absolutely clear in the PASA statute and in the legislative history that there was a strong desire to protect food producers and give them a priority over secured lenders who might have a lien in inventory and accounts receivable, and that Congress was very clear that there would be no tracing requirement because they considered it very impractical to implement.[105]

60.    This court does not consider the analogy that Blackhawk makes to the PACA and PASA statutes all that helpful or compelling to its cause.  First, this court reads the PACA and PASA statutes to create a floating trust on product delivered, the derivative products therefrom, the receivables therefrom, and—when any of these have been commingled in a batch of other assets—the trust would extend to the commingled batch without the need to trace.  The PACA and PASA statutes do not appear to provide that an unpaid vendor would have a trust or lien on a parcel of real estate a debtor owned in Nome, Alaska or the sale proceeds therefrom—that were far removed from any commingled assets—unless perhaps proceeds of the perishable goods had been used to make improvements on the Nome, Alaska land (in that situation, surely the vendor

---

[103] *See* 7 U.S.C. § 197(a) (2015).

[104] *First State Bank of Miami v. Gotham Provision Co. (In re Gotham Provision Co.)*, 669 F.2d 1000 (5th Cir. 1982).

[105] *Id.* at 1008-1012.

would be required to trace). Second, even if this court is wrong about the reach of PACA and

PASA, clearly Congress expressed an unambiguous intent in those statutes to protect the nation's

food growers, avoid a burden being placed on them when they sell product on credit, and

regulate the significant public interest in the food supply generally. There does not seem to be

this same grave policy concern that anyone has articulated when SVCs are put into the stream of

commerce. Third, it seems obvious that there is a tracing problem whenever meat gets carved

up, processed, and packaged; or produce gets processed into frozen dinners; or grapes get

transformed into wine, *etc.* There is a mutation and ultimate delivery into the stream of

commerce, and receivables are generated from the derivative products. This same

transformation and mutation does not occur with SVCs and cash. Yes, cash gets commingled,

but cash can nevertheless be tracked as it is deposited and later withdrawn or spent. Finally, it

may have some relevance that PACA and PASA are federal statutes and the State Money

Transmitter Laws are mere state statutes. In any event, there are certain cases that seem more

analogous to this court than cases interpreting PACA and PASA—some of which are in the

context of state statutes that create express trusts and some of which deal with common law that

creates constructive trusts in favor of unpaid creditors. These cases, discussed below, shed some

light on the problem with having a state statute or state common law mechanism that purports to

dispense with the need for tracing.

> **d. Can a State Statute Impose a Trust on General Assets of a Party That Dispenses With the Need for Tracing?**

61. First, it has been generally held that the concept of tracing, when either

constructive or express trusts are involved in a bankruptcy case, is necessary so as not to

contravene the Bankruptcy Code's priority provisions. Congress has specifically mandated how

bankruptcy estate assets will be distributed to creditors. The general rule in bankruptcy, with

regard to trusts, is that the beneficiary of the trust must be able to prove a particular fund is, in fact, its trust corpus/*res* (and, in the case of commingling, this requires tracing and application of the lowest intermediate balance rule—as discussed further below). This ensures that non-trust assets will be distributed in accordance with the Bankruptcy Code's priority system.

62. The Fifth Circuit Court of Appeals, in *In re Kennedy & Cohen, Inc.*,[106] addressed the issue of whether state law could operate to impose a lien on the general assets of a bankrupt, where a debtor had been under an obligation to segregate certain funds prepetition. To be clear, the *Kennedy & Cohen* case involved no state or federal **statute**, but simply a request by plaintiffs for a constructive trust (on the general assets of the debtor) as a tool of equity under common law. In *Kennedy & Cohen*,[107] the debtor was a retailer of appliances in various parts of Florida and several other states.[108] For two years, the debtor had accepted payments from many customers in return for a commitment to repair specified merchandise for periods that varied from nine months to five years.[109] As a result of the debtor-retailer filing bankruptcy, many of the contracts could not be performed, and the customers filed various claims and causes of action, seeking money damages from the trustee, arguing that the bankrupt was under a legally implied duty to segregate the customers' payments, and ultimately seeking a constructive trust over all the assets of the debtor.[110] In ruling against the customers and holding that a

---

[106] *Wisconsin v. Reese (In re Kennedy & Cohen, Inc.)*, 612 F.2d 963 (5th Cir. 1980).

[107] It is worth noting that the *Kennedy & Cohen* Fifth Circuit opinion was comprised of the relevant portions of the opinions that were actually written by the underlying district court and the bankruptcy court. *Id.* at 964.

[108] *Id.*

[109] *Id.*

[110] *Id*. at 964-65.

constructive trust could not be imposed against the general funds of a bankrupt, the Fifth Circuit

not only rejected the argument that the sale of maintenance contracts, without more, creates a

legal duty to segregate the funds received and imposes a constructive trust on them (noting the

lack of any statute that created such a duty), but also stated that the record was devoid of any

fraud, and (most pertinent to the case at bar) that there was *no identifiable res* and *the plaintiffs*

*could not even trace the funds paid for the warranty contracts*.  The court noted that imposing a

constructive trust on all assets of the debtor (in favor of these mere contract-parties) would

essentially elevate them in priority in payment ahead of secured creditors that had valid security

interests, ahead of administrative expense costs incurred during the bankruptcy, and all other

priority and unsecured claims. The court elaborated,

> Plaintiffs argue that the notion that funds must be traceable and the requirement
> that the *res* be identifiable are concepts of purely historical interest today, at least
> in the enlightened states of Wisconsin, Minnesota and Texas.  There are decisions
> that support this contention of the plaintiffs, at least in certain contexts.  However,
> it is a federal question whether a trust, whether express or constructive, which
> cannot be traced to specific assets, will attach to the creditors' general funds in
> bankruptcy."[111]

The court went on to add that "In *United States v. Randall*, 401 U.S. 515, 91 S. Ct. 991, 28

L.Ed.2d 273 (1971) the court held that the Bankruptcy Act is an overriding expression of federal

policy which precludes the imposition of a constructive trust in favor of the I.R.S. against

bankruptcy assets, even where the ingredients for a constructive trust are present."[112]  The Fifth

Circuit further cited with agreement the Ninth Circuit Court of Appeals' decision in *Elliot v.*

*Bumb*[113] (a case dealing with an actual *state statute* imposing a trust, as opposed to a common

---

[111] *Id*. at 965.

[112] *Id.*

[113] *Elliot v. Bumb*, 356 F.2d 749 (9th Cir. 1966).

law trust situation), that concluded that a "state statute insofar as it undertook to impress a lien upon general funds of the debtor, in effect, created a statutory lien in favor of a particular class of creditors. . . . The Supremacy Clause requires that conflicting state law give way to these [Bankruptcy Act priority] provisions."[114]   The Fifth Circuit added that there was "[n]o reason that a constructive trust which is imposed by State case law, assuming that to be the situation here, would warrant a different conclusion from the reach of *Elliot*, which dealt with an express trust imposed by State statute."[115]   The Fifth Circuit further quoted *Elliot* for the holding that "If state law is contrary to federal bankruptcy law, the state law must yield." [116]

63.   To elaborate on the *Elliot* holding, in that case a California vendor of money orders had filed bankruptcy and was subject to both a written agreement and a California state statute which required the vendor to segregate all payments received for money orders and, if the vendor failed to do so, the statute impressed a statutory trust on all funds of the vendor as necessary to honor the money orders.[117]   While the debtor in *Elliot* did not segregate enough funds as required under its written agreements and the California statute, the court nonetheless held that the holders of the money orders were merely general creditors of the debtor, to the extent their claims exceeded any traceable funds,[118] and they were entitled to no priority or other

---

[114] *Kennedy & Cohen*, 612 F.2d at 965-66.

[115] *Id.* at 966.

[116] *Id.*

[117] *Elliot*, 356 F.2d at 750-753.

[118] In *Elliot*, there were two pots of money at issue.  The first pot of money consisted of $2,014.99, which was comprised of segregated money order funds that had not been commingled and were entirely traceable.  *Id.* at 751, 753-54.  The court ultimately held that the first pot of money was to be turned over by the debtor to the trust claimant.  *Id.* at 754.  The second pot of money consisted of $1,094.17 that had been commingled with the debtor's other assets and, was therefore, untraceable.  *Id.* at 753-54.

special consideration ahead of any other creditors.[119]  Specifically, the Ninth Circuit concluded that the state statute, insofar as it undertook to impress a lien upon general funds of the debtor, in effect, created a statutory lien in favor of a particular class of creditors and, if enforced, would thwart or obstruct the scheme of federal bankruptcy.[120] Thus, the Ninth Circuit in *Elliot* found that the Supremacy Clause required that conflicting state laws must give way to these federal bankruptcy provisions.[121]

64.    The Fifth Circuit in *Kennedy & Cohen,* again, cited the *Elliot* opinion approvingly, stating that state laws such as those involved in *Kennedy & Cohen* and *Elliot* "would open the door to state creation of priorities in favor of various classes of creditors by labeling such priorities as "trusts" and thwart or obstruct the scheme of federal bankruptcy.[122]

65.    The closest factually on-point case that the parties have cited is *Callaway v. Memo Money Order Co.*,[123] which interpreted the North Carolina Money Transmitters Act ("NCMTA") and cited to both the *Kennedy & Cohen* case and *Elliot* case as guiding authority. On facts very similar to the case at bar, the district court in *Callaway* reversed the bankruptcy court's ruling that the NCMTA eliminated the need for the claimant to trace trust funds within a bankruptcy court.[124]

---

[119] *Id.* at 754-55.

[120] *Id.* at 755.

[121] *Id.*

[122] *Kennedy & Cohen*, 612 F.2d at 966; *see also Haber Oil Co. v. Swinehart (In re Haber Oil Co.)*, 12 F.3d 426, 435 (5th Cir. 1994) (while states can have some effect on the operation of the federal bankruptcy system by exercising their power to define property rights, it may not, of course, go so far as to manipulate bankruptcy priorities).

[123] *Callaway v. Memo Money Order Co.*, 381 B.R. 650 (E.D.N.C. 2008).

[124] *Id.*

66. Specifically in *Callaway*, a debtor/grocery store had entered into a prepetition agreement with a money order company, Memo.[125] The prepetition agreement required the debtor/grocery store to hold any funds received from money order sales in a separate, independent trust account and also contained a provision which purported to create a trust relationship between the debtor/grocery store and Memo.[126] The debtor/grocery store ultimately created two bank accounts, one for the money orders and one for general operating expenditures; however, at some point prepetition, the debtor/grocery store began to violate the prepetition agreement with Memo and started placing funds from the money order sales directly into its general operating account.[127] The debtor would then transfer funds from their general operating account to the money order account prior to Memo doing its anticipated sweep of the money order account.[128] After the debtor/grocery store filed for bankruptcy, the chapter 7 trustee took control of the debtor/grocery store and claimed the funds in both accounts as property of the bankruptcy estate (roughly $30,000 in the operating account and $39,000 in the money order account).[129] Memo eventually commenced an adversary proceeding claiming the $39,000 found in the money order account as its own and not property of the estate.[130] Specifically, Memo argued that it had rights to the funds not only under the terms of its prepetition agreement with the debtor/grocery store, but also under the NCMTA which provided that "if an authorized

---

[125] *Id.* at 652.

[126] *Id.*

[127] *Id.*

[128] *Id.*

[129] *Id.*

[130] *Id.*

delegate commingled any funds with any other funds or property owned or controlled by the authorized delegate, all commingled proceeds and other property shall be impressed with a trust in favor of the licensee in an amount equal to the amount of the proceeds due to the licensee."[131] The trustee, in response, argued that Memo had no rights to the funds, because they lost their trust character upon being commingled with the rest of the debtor/grocery store's funds in the general operating account, as it was the debtor/grocery store's regular business practice to put money order funds into the general operating account first and only then into the money order account when it was anticipated that Memo would be sweeping the account.[132]

67.     The district court ultimately held that any floating lien concept in the NCMTA did not apply in bankruptcy so as to eliminate the need to trace sale proceeds.  The court stated that, while state law generally determines whether a trust exists, tracing is an issue of federal not state law and, thus, the state law could not be applied to eliminate a federally-mandated tracing analysis.[133]  The Bankruptcy Code policy of equal distribution among similarly situated creditors applied, unless the trust beneficiary was able to satisfy the federal tracing requirement.[134]

68.     In summary, the court in *Callaway* emphasized that state law supplies the definition of property interests in bankruptcy only in the absence of countervailing federal interest.  The district court ultimately held that the North Carolina legislature could not alter the federal tracing requirement, noting that such requirement promoted the federal interest of "the Bankruptcy Code's policy of equal distribution among similarly situated creditors."[135]

---

[131] *Id.* at 653.

[132] *Id.*

[133] *Id.* at 655-56.

[134] *Id.* at 656.

[135] *Id.* at 655-56.

Interestingly, the bankruptcy court in *Callaway* had made an analogy, like Blackhawk does here, to the PACA statute in finding that the claimants under the NCMTA did not need to trace; however, the district court disagreed and reversed this ruling, and remanded the matter to the bankruptcy court to address the tracing issue.[136]

### e. Is This Really About the Supremacy Clause and Federal Preemption or Not?

69.     When reading the *Kennedy & Cohen*, *Elliot,* and *Callaway* cases, one is left thinking that perhaps this is all about federal preemption principles and the Supremacy Clause. After all, the courts made sweeping statements about how a state statute, insofar as it undertakes to impress a trust or lien upon general funds of a debtor, in favor of a particular class of creditors, thwarts or obstructs the priority scheme of federal bankruptcy and is unenforceable under the Supremacy Clause.

70.     However, it seems that these sweeping statements must be taken in context and cannot be too broadly applied.  As briefly mentioned above, as a general rule, ***state law*** defines property rights and interests, even when a party is in bankruptcy, and "[u]nless some federal interest requires some different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in bankruptcy proceedings."[137]   And Congress did not mean to authorize a bankruptcy estate to benefit from property that the debtor did not own or in which it did not have equitable rights.  Section 541(d) of the Bankruptcy Code is quite clear on this point, stating that "Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest . . . becomes property of

---

[136] *Id.* at 656-657.

[137] *Butner v. United States,* 440 U.S. 48, 55 (1979).

the estate . . . only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold."[138]

71.     Moreover, section 545 of the Bankruptcy Code specifically provides for the avoidance of particular types of statutory liens—most notably, liens that first become effective against a debtor when a bankruptcy case is commenced, or when non-bankruptcy court insolvency proceedings are commenced, or when a custodian is appointed, or when the debtor becomes insolvent or its financial condition meets a certain standard—but *not all statutory liens are avoidable*.  For example, a statutory lien that is enforceable at the time of the commencement of the case against certain types of bona fide purchasers for value *is* enforceable in bankruptcy.[139] There are various reported cases that recognize a statutory lien in bankruptcy, even though it ultimately has the effect of allowing a creditor to step ahead of other creditors in the bankruptcy priority scheme.  For example, the Fifth Circuit, in a case called *Bernard v. Beneficial Fin. Co. (In re Trahan),* has held that a Louisiana "vendor's privilege" is enforceable in bankruptcy.[140]  In the *Trahan* case, the district court had been confronted with a Louisiana statute that afforded a "vendor's privilege" to the seller of movable merchandise (here, it had been furniture sold to the debtor by a furniture store dealer).  There was a requirement that the movable merchandise still be in the possession of the buyer/debtor for the privilege to remain intact.  The furniture had been sold on credit to and was still in the hands of the buyer/debtor.  The question was, whether the

---

[138] 11 U.S.C. § 541(d) (2015).  There are snippets of legislative history underlying this section that indicate that there was an intent that the Bankruptcy Code would "not affect various statutory provisions . . . that create a trust fund for the benefit of a creditor of the debtor."  S. Rep. 989 at 82, 95th Cong., 2d Sess. (1978), U.S. Code Cong. & Admin. News 1978, pp. 5787 at 5868; 124 Cong. Rec. S17.413 (daily ed. Oc. 6, 1978) (remarks of Sen. De Concini); 129 Cong. Rec. H11,096 (daily ed. Sept. 28, 1978) (remarks of Rep. Edwards).

[139] 11 U.S.C. § 545 (2015).

[140] *Bernard v. Beneficial Fin. Co. (In re Trahan)*, 402 F.2d 796 (5th Cir. 1968) (adopting district court opinion at 283 F. Supp. 620 (W.D. La. 1986)).

"vendor's privilege" was a statutory lien that a bankruptcy trustee could avoid in buyer/debtor's bankruptcy case. Interpreting the predecessor of section 545, the court noted that it reflected a policy against allowing those creditors whose only security was "a state-created priority which is not a 'lien' to assert their 'priority' claims as secured claims against the assets" of a bankruptcy debtor.[141] The court further stated that state law determines the nature of the vendor's privilege, but that federal bankruptcy law determines whether or not a right of that nature is a secured claim.[142] The term "privilege" as used in the Louisiana civil system was held to be equivalent to the concept of a lien, even though the word "lien" was not used. And the privilege would be enforceable against a bona fide purchaser for value under Louisiana state law. Thus, it was held to be enforceable in the bankruptcy case.[143]

72. Another noteworthy case on this subject is the Ninth Circuit case of *Saslow v. Andrew (In re Loretto Winery Ltd.)*.[144] In *Saslow*, the debtor was a winery. A vendor had delivered partially processed grapes to the debtor to use for wine and wine products. The vendor sent grapes to the debtor eight days before the debtor filed bankruptcy. The debtor still had possession of the grapes at the time it filed bankruptcy. The vendor argued that the grapes were subject to a statutory lien, pursuant to a California statute providing for a producer's lien on any farm product grown by him and sold to any processor. The lien reached to the product and

---

[141] *In re Trahan*, 283 F. Supp. 620, 621 (W.D. La. 1968).

[142] *Id.* at 622.

[143] *See also Borg-Warner Acceptance Corp. v. Tape City, U.S.A., Inc. (In re Tape City, U.S.A., Inc.)*, 677 F.2d 401 (5th Cir. 1982) (involved same statute as *Trahan* case and applied statute the same way, without much analysis; clarified that vendor's privilege is lost upon buyer's loss of possession but only if buyer loses possession because he actually sells the goods); *Explorer Drilling Co. v. Martin Exploration Co. (In re Martin Exploration Co.)*, 731 F.2d 1210 (5th Cir. 1984) (involved same statute as *Trahan* case and applied statute the same way, without much analysis; goods in question were pipe).

[144] *Saslow v. Andrew (In re Loretto Winery Ltd.)*, 898 F.2d 715 (9th Cir. 1990).

"upon all processed or manufactured forms of such farm product for his labor, care, and expense in growing and harvesting such product."[145] The lien was defined to remain on grapes only as long as a processor retained possession under California law (warehouse storage was not considered to divest possession). Segregation versus commingling did not matter, and it did not matter if the product had been processed from its original form. The lien of the grape seller was defined as being primary to all others (with certain exceptions named). The legislative history underlying the statute made clear the strong desire of the California legislature to promote and protect the agricultural industry.

73.     The trustee argued that section 545(2) of the Bankruptcy Code allowed avoidance of the lien. While the lower courts agreed with the trustee, the Ninth Circuit reversed. The Ninth Circuit noted that, under section 545(1) of the Bankruptcy Code, a trustee can avoid liens that first arise only upon the debtor's bankruptcy or insolvency, because "Congress has perceived such liens to be thinly disguised attempts to impose state-determined priorities in bankruptcy."[146] The California statute did not fit into this category. Subsection (2) of section 545 allows a trustee to avoid a lien that "is not perfected or enforceable at the time of the commencement of the case against a bona fide purchaser that purchases such property at the time of the commencement of the case, whether or not such purchaser exists (the "hypothetical bona fide purchaser test)."[147] The court stated that whether the lien was enforceable against a bona fide purchaser was determined under state law. The court further noted that courts cannot "baldly

---

[145] *Id.* at 720 (citing Cal. Food & Agric. Code §§ 55631-55653 (West 1986 & Supp. 1989)).

[146] *Id.* at 718.

[147] *Id.*

46

impose their own priorities on federal bankruptcy proceedings."[148] Section 545 of the Bankruptcy Code is an example of how federal bankruptcy law does sometime bow to state statutory liens that meet certain criteria. And while section 545 of the Bankruptcy Code articulates how certain type of state liens can be avoided in bankruptcy, the court went on to hold that a trustee cannot avoid a lien in his role as a hypothetical bona fide purchaser *merely because the lien is secret* (noting that the California statute *did not have any notice or filing requirement*). Ultimately, the test is whether, under state law, the lien is avoidable by a bona fide purchaser. Since the court determined that, under California law, the grape grower's lien was not avoidable by a bona fide purchaser, it would be recognized in bankruptcy. The Ninth Circuit cited the Fifth Circuit as having held several times that a trustee cannot avoid a statutory lien that happens to be secret (*i.e.* a lien that arises automatically with no formal perfection requirements).[149]

74. Yet another noteworthy case on this subject is the *Lonestar Milk Producers, Inc. v. Litzler*[150] case out of this District (Judge Harlin Hale presiding). This case involved chapter 181 of the Texas Agriculture Code, the so-called Texas milk statute, which requires milk processors to hold in trust, for the benefit of the dairy farmer from whom raw milk was purchased, all payments received from the sale of the milk until the dairy farmer is paid in full.

---

[148] *Id.*

[149] *Id.* at 725 (citing *Trahan*, 402 F.2d at 796; *Tape City*, 677 F.2 at 401; *Martin Exploration Co.*, 731 F.2d at 1210; *Avdoyan v. Davis Water & Waste Indus. (In re Lowery Bros., Inc.)*, 589 F.2d 851 (5th Cir. 1979)). Note that three out of these four cases were mentioned earlier herein (*Trahan, Tape City*, and *Martin Exploration*) and dealt with the Louisiana "vendor's privilege" in favor of a seller of merchandise, which so-called vendor privilege did not have a requirement of recordation or notice. The Fifth Circuit held that the trustee could not avoid the vendor privilege under the predecessor of section 545 of the Bankruptcy Code because, under state law, the vendor privilege would be enforceable against a bona fide purchaser for value.

[150] *Lonestar Milk Producers, Inc. v. Litzler*, 370 B.R. 671 (Bankr. N.D. Tex. 2007) (J. Hale).

75.    In *Lonestar*, the debtor manufactured and sold ice cream products.  After the debtor's bankruptcy case was filed, the Chapter 7 Trustee obtained authority to sell finished ice cream products and certain raw materials to various purchasers for cash.  Meanwhile, certain dairy farmers who had supplied raw milk and skim condensed milk to the debtor and were owed more than $500,000 filed an adversary proceeding against both the trustee and the secured lender of the debtor.  The secured lender claimed a first priority security interest in substantially all of the debtor's assets, including inventory, farm products and receivables, as well as proceeds thereof.  The dairy farmers wanted a turnover of funds in a lock box, into which had been deposited sale proceeds from both pre and postpetition sales of dairy products, arguing that the funds were trust finds of the dairy farmers, were not subject to the prior, perfect liens of the secured lender, and there was no tracing requirement.

76.    The court noted that the applicable Texas statute states that "a milk processor shall hold in trust all payments received from the sale of milk for the benefit of the dairy farmer from whom the milk was purchased until the dairy farmer has received full payment of the purchase price for the milk."[151]  Another provision of the statute states that "funds held in trust by a milk processor in an escrow account are the property of the dairy farmer."[152]  Based on the language of the statute, the tracing requirement (or not) was uncertain.  However, Judge Hale held that, not only did the statute create an express trust, meaning the dairy product proceeds never became property of the debtor, but the statute also contemplated commingling of raw milk from multiple dairy farmers and did not require tracing.  The court determined that this was

---

[151] *Id.* at 676 (citing Tex. Agric. Code Ann. § 181.002(a) (Vernon 2004)).

[152] *Lonestar*, 370 B.R. at 676 (citing Tex. Agric. Code Ann. § 181.002(f) (Vernon 2004)).

implied by certain language addressing how deposits would be made. Moreover, tracing was practically impossible for the dairy farmers.

77. Judge Hale reasoned that this statute was analogous to the PACA and PASA statutes which have been held to require no tracing. The court clearly recognized that a state statute was involved here, not a federal one like PACA and PASA, noting at one point that "the ability of a state to create trusts excluding property from the bankruptcy estates is clearly not without limitation. For instance, states may not create laws that are solely meant to manipulate the bankruptcy priorities"[153] and "[s]tates also may not create laws that create liens effective only in bankruptcy."[154] Judge Hale thought that the Texas milk statute must be applied in a bankruptcy case because, ultimately, it had a function outside of bankruptcy.

78. So what does all this mean? Are the cases of *Kennedy & Cohen* and *Elliot* and *Callaway* (all of which seem to emphasize **the Supremacy Clause** and **federal preemption**) reconcilable with *Trahan*, *Saslow, Lonestar, and Quality Holstein* (all of which seem to emphasize **giving deference to state law to define property interests** and also acknowledge the permissibility of state statutory liens so long as they do not run afoul of section 545 of the Bankruptcy Code and would be enforceable against a bona fide purchaser for value under state law)? Is a statutory lien all that different from a statutory or even common law constructive trust? If this is not all reconcilable, which is the correct analysis for the case at bar?

---

[153] *Lonestar*, 370 B.R. at 676 (citing *Haber Oil Co. v. Swinehart (In re Haber Oil Co.)*, 12 F.3d 426, 435 (5th Cir. 1994)).

[154] *Lonestar*, 370 B.R. at 676 (citing *Vineyard v. McKenzie (In re Quality Holstein Leasing)*, 752 F.2d 1009, 1014 (5th Cir. 1985)).

79.    The answer is that these cases are reconcilable and all of their reasoning is relevant to the case at bar.  While reasonable minds may differ,[155] it appears to this court that the above authority can be reconciled as collectively standing for the following general principles: (a) the Bankruptcy Code is the starting point for determining both what is "property of the estate" and priority of payment of creditors, and it is an overriding expression of public policy that should generally control;[156] (b) at the same time, bankruptcy courts must pay deference to state laws when it comes to defining property interests;[157]  (c) bankruptcy courts must balance

---

[155] One scholar has suggested that these various cases can only be reconciled if one assumes:  (a) that *statutory lien* cases should be analyzed *differently* for purposes of bankruptcy law than *trust* cases; or (b) that while state law may dictate priority outcomes with respect to *specific, identified assets*, state law cannot do so in bankruptcy with respect to the debtor's *general* assets.  Thomas H. Jackson, *Statutory Liens and Constructive Trusts in Bankruptcy:  Undoing the Confusion*, 61 AM. BANKR. L.J. 287, 288 (1987).  Professor Jackson argues that neither of these two distinctions is truly consistent with the Bankruptcy Code and policy, and courts should view statutory liens and trusts alike and simply look at whether any particular state law priority imposed has "force and effect outside of, as well as inside of, bankruptcy's collective proceeding."  *Id.*  This court begs to differ with the suggestion that any state law priority that has "force and effect outside of, as well as inside of, bankruptcy's collective proceeding" should be permitted deference in bankruptcy.  This judge is reminded of her former colleague's *"flat moose theory."*  The "flat moose theory" works something like this.  Suppose a state legislature enacted a state law that provided that all tort claimants of companies doing business in their state would be granted a statutory trust or lien on specific (or even general) assets of the debtor-company that would be entitled to payment ahead of all other creditors until the tort claimants' allowed claims were paid in full.  The rationale being, if a victim is innocently walking down the sidewalk past, say, a monolithic, multi-story moose rendering facility, and a huge moose darts out of a window crushing (or flattening) the innocent pedestrian, then the innocent pedestrian (now tort claimant) should be treated differently than the *voluntary* creditors of the company who chose to do business with the company.  (Actually, similarly, since the 1970s, academic and others have discussed this issue of whether involuntary creditors, such as tort creditors, should receive super-priority over secured creditors in Article 9 of the Uniform Commercial Code.  *See generally Kristen van de Biezenbos, A Sea Change in Creditor Priorities*, 48 UNIV. OF MICH. J.L. REFORM 595 (2015) (and numerous articles cited therein). The debate never seems to gain much traction.)  Anyway, while Congress can decide to amend section 507 of the Bankruptcy Code, if it thinks that involuntary tort creditors should have special priority of some sort in a bankruptcy case, *it would seem* that a state legislature would be inappropriately interfering with federal bankruptcy law priorities if it tried such a thing (no matter if the law would have the same "force and effect outside of, as well as inside of" a bankruptcy case) and such statutory trust or lien would be unenforceable.  Or would it?  Credit goes to Robin E. Phelan, Esq., this judge's former colleague, for the "flat moose theory" (although this judge always wondered why he didn't call it the "tort claimant flattened by moose theory").  *See generally Robin E. Phelan, The American Bankruptcy Institute Considers Flat People Under Moose and Other Important Insolvency Issues* (publication information unavailable; contact American Bankruptcy Institute or author for copy).

[156] *E.g.,* 11 U.S.C. §§ 507 & 541 (2015); *Kennedy & Cohen*, 612 F.2d at 965 (citing *United States v. Randall*, 401 U.S. 513 (1971)).

[157] *Haber Oil*, 12 F.3d at 435; *Quality Holstein*, 752 F.2d at 1014.

these two concerns by scrutinizing any given state statute to determine whether it is an over-reaching attempt to impose state-determined priorities in bankruptcy (if it is, it must yield to the Bankruptcy Code's priority provisions);[158] (d) section 545 of the Bankruptcy Code provides a general template in a bankruptcy case for when a state statutory lien will prevail in a bankruptcy case;[159] (e) if a state statute creates a property right in favor of a creditor that is more in the nature of an "express trust" rather than a "statutory lien," while it may fall outside of the parameters of section 545 of the Bankruptcy Code, it still may be recognized in a bankruptcy case, so long as it does not appear to be a thinly disguised attempt to impose state-determined priorities in bankruptcy[160] (and it would seem more likely to be problematic if the trust corpus is broad, such as reaching the general assets of the debtor);[161] and (f) when recognizing the validity of a state statutory or constructive trust in a bankruptcy case, generally tracing must be applied unless there is a clear policy reason articulated by a legislature for dispensing with the need for tracing and tracing is practically impossible.[162]

80.     Applying these principles to the case at bar leads to the conclusion that the State Money Transmitter Laws (even to the extent they operate to give Blackhawk a floating trust or lien on all general assets of the Debtor), cannot be applied in a bankruptcy case so as to dispense with the need for tracing.   Which then begs the question, how does one trace in the case at bar?

---

[158] *Quality Holstein*, 752 F.2d at 1014 ("State law defining property rights may not, of course, go so far as to manipulate bankruptcy priorities").

[159] *Saslow*, 898 F.2d at 715.

[160] *See generally Trahan*, 402 F.2d at 715; *Lonestar*, 370 B.R. at 676.

[161] *See generally Haber Oil*, 12 F.3d at 442 (noting that a constructive trust can attach only to a specific *res*, or to some identifiable property that can be traced back to the original *res*; court stated that this was requirement of Texas law and federal bankruptcy law).  Presumably the same notion of there being a specific *res* should apply with statutory trusts.

[162] *See generally id.; Gotham*, 669 F.2d at 1008-1012; *Lonestar*, 370 B.R. at 676.

### f.   The Federal Tracing Requirement and the Lowest Intermediate Balance Rule

81.    With regard to the federal tracing requirement, which requires a trust recipient to identify and trace its alleged trust funds, courts have applied the lowest intermediate balance rule when trust proceeds are commingled with non-trust proceeds in a debtor's account.[163]  This rule was originally articulated by the Supreme Court and has long been followed in bankruptcy jurisprudence.[164]  Specifically, the lowest intermediate balance rule states that when a trust beneficiary's funds, despite being traceable into the debtor's account, are "commingled in accounts that were drawn upon, the trust beneficiary's recovery [is] limited to the lowest balance between the time of deposit of the [funds] . . . and the filing of the [bankruptcy] petition."[165]  The rule is intended to allow a trustee beneficiary to properly trace his or her funds in a commingled account and is "grounded in the fiction that, when faced with the need to withdraw funds from a

---

[163] *Tex. Comptroller of Public Accounts v. Weathers (In re Vaughn Motors, Inc.)*, 248 F.3d 1140, 2001 WL 85918, at *2 (5th Cir. Jan. 25. 2001) (unpublished opinion stating that courts generally apply the lowest intermediate balance rule when trust proceeds are commingled with non-trust proceeds); *United States v. McConnell (In re Flying Boat, Inc.)*, 258 B.R. 869, 875  (N.D. Tex. 2001) (lowest intermediate balance test is applicable where trust funds have been commingled with other funds and the court is to determine if the trust funds can be properly traced); *see also Old Republic Nat'l Title Ins. Co. v. Tyler (In re Dameron)*, 155 F.3d 718, 724 (4th Cir. 1998); *Al Copeland Enter. v. Texas (In re Al Copeland Enter.)*, 991 F.2d 233, 235 n.1 (5th Cir. 1993); *Conn. General Life Ins. Co. v. Universal Ins. Co.*, 838 F.2d 612, 619 (1st Cir. 1988); *Turley v. Mahan & Rowsey, Inc. (In re Mahan & Rowsey, Inc.)*, 817 F.2d 682, 684-685 (10th Cir. 1987).  Note, Blackhawk has argued that a different rule other than the lowest intermediate balance rule should apply and cites to a district court opinion, *Bethlehem Steel v. Tidwell*, 66 B.R. 932 (M.D. Ga. 1986), as support for such proposition.  Specifically, the district court in *Bethlehem Steel* appeared to apply a different rule then the lowest intermediate balance rule and held that "when a trustee replenishes a commingled account which has fallen below the amount held in trust due to the trustee's invasion, the trustee is presumed to return the beneficiary's money first for the same reasons that we presume that the trustee would use his own money first when withdrawing from the account," citing to the bankruptcy case, *Turley v. Mahan & Rowsey, Inc. (In Re Mahan & Rowsey, Inc.)*, 35 B.R. 898, 903-04 (Bankr. W.D. Okla. 1983).  In other words, the rule articulated in *Bethlehem Steel* would allow the court to consider subsequent deposits made by a trustee into a commingled account.  However, as noted above, the bankruptcy opinion relied upon by the bankruptcy court in *Bethlehem Steel* (*i.e.*, the case of *Mahan & Rowsey*) was reversed on appeal and both the reviewing district court and the Tenth Circuit Court of Appeals ultimately held that the lowest intermediate balance rule was to be applied.

[164] *Mahan & Rowsey*, 817 F.2d at 684-85 (citing *Schulyer v. Littlefield*, 232 U.S. 707 (1914) & *Cunningham v. Brown*, 265 U.S. 1 (1924) & *Sonnenschein v. Reliance Ins. Co.*, 353 F.2d 935 (2d Cir. 1965)).

[165] *Mahan & Rowsey*, 817 F.2d at 683-84.

commingled account, the trustee withdraws non-trust funds first, thus maintaining as much of the trust's funds as possible."[166]  This rule, however, cuts both ways: if the commingled fund has been reduced "below the level of the trust fund but not depleted, the claimant is entitled to the lowest intermediate balance in the account."[167]  In other words, the trust beneficiary is "entitled to the lowest intermediate balance, without the benefit of any deposits made after such balance was reached."[168]

82.     Here, the undisputed material facts demonstrate that the SVC sale proceeds were commingled with the Debtor's other assets in the Master Depository Account.  Moreover, the undisputed material facts demonstrate that the lowest intermediate balance in the Master Depository Account between September 23, 2014 and the Petition Date was $0, since the Master Depository Account was swept by Wells Fargo on a daily basis.  Accordingly, Blackhawk would not be entitled to any funds from the Debtor under the lowest intermediate balance rule and, accordingly, even if this court were to impose a floating trust on general assets, Blackhawk's Adversary Complaint would still fail.

## VI.    CONCLUSION

Clearly, Alco committed breach of contract.  Clearly, Blackhawk was entitled to assert a claim in this bankruptcy case.  As noted by Judge King in *Haber Oil*, "The bankruptcy reporters, however, are replete with stories of creditors who have furnished goods or services to a debtor, only to find that, despite their frequent demands and the debtor's countless reassurances, the debtor's promise or payment continues in breach."[169]  The lesson in this case for money

---

[166] *Dameron*, 155 F.3d at 724.

[167] *Id.*

[168] *Id.*

[169] *Haber Oil,* 12 F.3d at 443.

transmitters is, unless and until Congress chooses to enact federal legislation of its own giving specific protection to money transmitters (similar to PACA and PSA), the Bankruptcy Code and bankruptcy jurisprudence will mandate the result herein. Blackhawk simply has, at best, a general unsecured claim. Obviously, there are ways that money transmitters can be more vigilant to avoid this result in a bankruptcy—such as by putting in place tighter controls to avoid commingling or difficulty with tracing their funds *vis-à-vis* their vendors (*e.g.,* establish an account for all deposits from sales of SVCs, with such account showing funds are held in trust for Blackhawk).[170]

Accordingly, it is

**ORDERED** that the Debtor's Motion for Summary Judgment is **GRANTED**; and it is further

**ORDERED** that the Adversary Complaint of Blackhawk is hereby dismissed; and it is further

**ORDERED** that counsel for the Debtor shall upload a separate form of judgment consistent with the ruling above.

### ###END OF MEMORANDUM OPINION AND ORDER###

---

[170] Exhibit A to the Authorized Delegate Agreement (definition of "Designated Account") seemed to contemplate such a mechanism but it appeared to not be a mandatory feature of the agreement and not ever implemented.